Alexandru GUI, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 00–70287.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 2001

Filed Feb. 8, 2002.

Leah W. Hurwitz, Esq., San Diego, California, for the petitioner.

Ronald E. LeFevre, Chief Legal Officer, Immigration and Naturalization Service, San Francisco, California, for the respondent.

Mark C. Walters, Christine Bither, Thankful T. Vanderstar, and Anh–Thu P. Mai, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington D.C., for the respondent.

Before: B. FLETCHER, T.G. NELSON and BERZON, Circuit Judges.

**BETTY B. FLETCHER, Circuit Judge:**

Alexandru Gui petitions this court for review of a decision of the Board of Immigration Appeals ("BIA"). Mr. Gui, who became politically active in his opposition to Communism following Romania's 1989 revolution, contends he was persecuted in 1990 and 1991 on account of his political beliefs. The Immigration Judge ("IJ") did not find Mr. Gui credible and thus held that he did not establish past persecution or the well-founded fear of future persecution necessary for a grant of asylum or withholding of deportation. Mr. Gui appealed the IJ's decision to the BIA and filed a Motion to Remand for reconsideration of claims based on the regulations implementing the United Nations Convention Against Torture. The BIA affirmed the IJ's denial of asylum and withholding of deportation and denied Mr. Gui's motion to reopen the proceedings to assert a claim under the Convention Against Torture. We grant the timely petition for review, find eligibility for asylum, deny withholding of deportation, deny relief under the United Nations Convention Against Torture, and remand to the BIA for an exercise of discretion by the Attorney General as to the grant of asylum.

**JURISDICTION**

On February 18, 2000, the BIA entered its final order dismissing Mr. Gui's administrative appeal. Because the Board entered its ruling after October 30, 1996, and because Mr. Gui's case was pending before April 1, 1997, the transitional judicial review rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) apply. Pub.L. No. 104–208, 110 Stat. 3546 (Sept. 30, 1996); *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir.1997). The panel has jurisdiction pursuant to 8 U.S.C. § 1105a(a), as amended by IIRIRA.

**BACKGROUND**

*Mr. Gui's Story*

According to his application for asylum and his testimony before the IJ, Mr. Gui comes from an anti-Communist family that opposed the repressive Communist regime that governed Romania from 1947 until a 1989 revolution felled the government of

Nicolae Ceausescu. Mr. Gui's grandfather, a member of the National Peasants Party, which opposed the communist regime, was sentenced to five years in a labor camp because he was a landowner and a professor. Mr. Gui's aunt emigrated to the United States over thirty years ago and has settled in San Diego.

Mr. Gui's family has suffered harassment since at least the 1960s. Because of his aunt's emigration, the Romanian government considered the Guis traitors and kept them under close surveillance. At various times, family members reported as ordered to the police station for interrogations. Police repeatedly searched the Gui home without a warrant. The Guis' telephone has been tapped since at least 1976.

As a medical student in the early 1980s, Mr. Gui joined the Romanian Communist Party based on his belief that he would be sent either to jail or to a prison camp if he refused. He renounced his party membership immediately upon the overthrow of the Communist regime in 1989. Mr. Gui supports the Alianta Civica Organization and recognizes the legitimacy of King Michael.[1]

After the Ceausescu government fell in 1989, Mr. Gui believed that the new government, led by former Communist functionary and long-time Ceausescu foe Ion Iliescu, continued to be antidemocratic and run in large part by the former Communists. In particular, Mr. Gui noted the inclusion of several thousand members of the former state security agency, the Securitate, in the new Romanian Intelligence Service, as well as the appointment of several former communists to positions of power in the new government.

Nonetheless, relying on the new government's proclaimed commitment to democracy and openness, Mr. Gui became a local political activist. He participated in and addressed meetings opposing communist power, spoke on local television, created and distributed political literature, and agitated for the human rights of Hungarians and other minorities.

On September 5, 1990—just nine months after the Iliescu government assumed power—police ordered Mr. Gui to the police station. There, officers interrogated him for 24 hours regarding his authorship and dissemination of leaflets and other political activities. The police threatened him and warned him to cease his political activities. Because his political activities were not formally punishable, the police instead charged him with "disturbing the public peace" and forced him to pay a hefty fine to obtain release.

As Mr. Gui's political activism continued, so too did harassment by authorities. Mr. Gui's telephone conversations were tapped. His mail arrived opened or not at all. Because of his success as a surgeon, Mr. Gui maintained homes both in his home town and in the town where he worked; police searched both dwellings without warrants and seized documents, newspapers, photos, posters, and letters.

On December 30, 1990—a year after the fall of the Ceausescu government—a large truck driven by a man who had regularly been following Mr. Gui's car rammed the car from behind, propelling Mr. Gui across a set of railroad tracks at which he had been stopped. Mr. Gui recognized the hit-and-run incident as a common activity of the Romanian secret police, who he says staged such "accidents" to cause injury or

---

1. King Michael led a coup that overthrew a pro-Axis dictatorship in 1944. King Michael went into exile in 1947 when the Communist Romanian People's Republic was born. BU-REAU OF EUROPEAN AFFAIRS, U.S. DEP'T OF STATE, BACKGROUND NOTE: ROMANIA, (July 2000).

death without their being traceable to the government. In the summer of 1991, another hit-and-run accident sent Mr. Gui's car into a three-foot deep ditch. Mr. Gui once again reported the accident and this time was able not only to describe the driver, but also to provide the license plate number of the car that had rammed him. He had adopted the habit of noting license numbers of cars that tailed him. The license plates turned out to be phony and the assailant was never found.

Believing he "had two options, either to stay in my country and continue to ... have unfortunate accidents or to ... leave and get away and put the ocean between me and them," Mr. Gui left Romania in December 1991. After his departure, the government harassed his parents for information about their son. After the police once again searched Mr. Gui's apartment, they detained his mother at the police station and interrogated her for eight hours. Detailing her experience in a letter presented to the IJ, Mrs. Gui told her son that she was now required to provide monthly reports about him.

Fearing for his life should he return to Romania, Mr. Gui applied for asylum on January 21, 1992, just one month and one day after he entered the United States. Mr. Gui fears that his life is at risk because "the Communists are still in power in Romania and are still persecuting people that oppose their policy. This knowledge of the present situation when added to my past experiences of nearly being killed, suffering injuries, constant surveillance by Securitate, moral distress, make my fear of returning extreme."

*Findings of the Immigration Judge*

In addition to his own affidavit, his mother's letter, and 1996 correspondence from a surgeon friend telling of continued harassment, Mr. Gui's briefing to the IJ included dozens of articles spanning 1990–1995 that detailed the continuing power of the former Communists in the government generally and in the police and intelligence forces particularly. Nonetheless, in his August 19, 1996 decision, rendered immediately following Mr. Gui's hearing, the IJ denied Mr. Gui's requests for asylum and withholding of deportation based on his finding that Mr. Gui was not credible. Because he disbelieved his claims, the IJ concluded that Mr. Gui had not satisfied his burden of proving he had a well-founded fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion.

The IJ doubted several of Mr. Gui's allegations. First, the IJ took issue with Mr. Gui's allegation that his phones were tapped. As proof of the tapping, Mr. Gui had explained that police had interrogated him about information he remembered providing to others by telephone. The IJ, pointing out that Mr. Gui alleged his phones had been tapped since at least 1976, found it "extremely implausible" that Mr. Gui would discuss "incriminating information" on the phone if he knew the government was eavesdropping.

The IJ also found significant fault with Mr. Gui's testimony about the two hit-and-run car crashes. With respect to the 1990 crash, the IJ did not express any specific opinion about whether or not the accident may have occurred, but instead focused on Mr. Gui's claim that he reported the accident to the police and described the face of the driver, whom he recognized as someone who had followed him in the past. The IJ's only statement about the matter was that "[i]t would seem rather difficult for a police organization, even if they attempted to do a thorough investigation, to be able to find someone strictly by a description of a face."

With respect to the 1991 hit-and-run, the IJ did not believe that someone staging an accident would do so by forcing a car off the road into a three foot ditch adjacent to a field. Instead, the IJ believed it "would seem more plausible that a person attempting to kill someone would attempt to force that vehicle off the road where there was a cliff or some other impediment that would cause harm to the driver of the victim's car." The IJ also disbelieved that Mr. Gui would have noted the license plate number of the car once he noted it was following him.

The IJ did not believe Mr. Gui's claim that he fears he will be hurt or killed if he returns to Romania. The IJ concluded that if the Romanian government were truly as repressive as Mr. Gui contends, it would have killed him when it took him into custody in 1991. Discounting Mr. Gui's argument that the government would not kill him under those circumstances because his family and others would ask questions, the IJ maintained that:

> [a] truly repressive government would have no fear of people questioning how someone died. I feel that the Respondent was on the one hand saying this is a terribly repressive government but on the other hand stating that the government of Romania is so weak that it would fear people questioning the death of various individuals in Romania. I found this portion of his testimony to be inconsistent and implausible.

The IJ further disbelieved Mr. Gui's claim that the Romanian secret police are dangerous, finding:

> This same secret police would attempt to harm him or kill him by staging rather amateurish automobile accidents. If this was such a dangerous secret police who thought of the Respondent as being someone who is a danger to the government, it appears that this secret police

could have easily killed him with a firearm or other type of weapon.

The IJ also found it suspicious that the only two letters Mr. Gui provided—one from his mother detailing her detention and the search of the home she shared with Mr. Gui and one from his surgeon friend—both arrived in the spring of 1996 when Mr. Gui's deportation hearing was first scheduled.

Finally, the IJ found it implausible that someone considered a dissident would have been permitted a state-funded education and lucrative employment as a surgeon. The IJ took particular note of Mr. Gui's wealth: "The Respondent stated that he owned two homes and a car in Romania. From his testimony this appears to be an individual who is in the upper level of the socioeconomic strata in Romania. If the government wanted to persecute him, it would appear that they could have easily confiscated his property if they are the tyrannical government that he states."

*BIA Decision and Order*

In its decision denying asylum and withholding of deportation, the BIA summarized the grounds upon which the IJ had based his credibility determination and stated that, "[a]fter a thorough review of the record, we agree that the respondent's asylum claim is implausible and does not support a grant of asylum." Concluding that Mr. Gui lacked credible testimony, the Board concluded that he had failed to establish his eligibility for asylum or withholding of deportation. In making its determination, the BIA noted that, because of a 1996 change in government and independent of the credibility determination, "[t]he evidence of record establishes that country conditions have changed to such an extent that any fear the respondent may have had of returning because of his prior anti-government activities should be significantly diminished."

## DISCUSSION

### Credibility Determination

 We review an adverse credibility finding under the substantial evidence standard. *Yi Quan Chen v. INS*, 266 F.3d 1094, 1098 (9th Cir.2001). Where the BIA incorporates the IJ's decision, we review the IJ's decision. *Lopez–Reyes v. INS*, 79 F.3d 908, 911 (9th Cir.1996). Although the substantial evidence standard is deferential, the IJ must provide "a specific cogent reason" for the adverse credibility finding. *Yi Quan Chen*, 266 F.3d at 1098.

 While the substantial evidence standard demands deference to the IJ, "[w]e do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion and determine whether the reasoning employed by the IJ is fatally flawed." *Osorio v. INS*, 99 F.3d 928, 931(9th Cir.1996), (quoting *Aguilera–Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir.1990)). The IJ "must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." *Id.* (quoting *Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir.1994)). Any such reason "must be substantial and bear a legitimate nexus to the finding." *Id.* (quoting *Mosa v. Rogers*, 89 F.3d 601, 604 (9th Cir.1996)).

The IJ doubted Mr. Gui's credibility on several fronts. He disbelieved the tapping of Mr. Gui's phones in Romania, the hit-and-run crashes, and the repressiveness of the Romanian government and the power of its secret police. He apparently thought the content of the two 1996 letters offered in support of Mr. Gui's application suspect because of the timing of their receipt and thought that the Romanian government's willingness to permit Mr. Gui to practice medicine and become wealthy belied any disapproval of his politics.

### Phone Tapping

 In his testimony to the IJ, Mr. Gui alleged that his family's phone had been tapped. He testified that, in addition to hearing a click often when he spoke on the phone, when he and his family members were called to report to the police they were questioned about matters they had discussed on the phone. According to Mr. Gui, "I remember my conversations on the phone and then when I was pulled to the headquarters I was asked exactly about those kind of conversations." Responding to the IJ's question, Mr. Gui reported that he had been aware that his family's phone was tapped since roughly 1976.

The IJ found it doubtful that someone who knew his phone was tapped would discuss "incriminating" things on the phone. However, as Mr. Gui noted, it is not always clear what information may be of interest to security forces. Making a plan to meet with a friend, for example, could give rise to questioning under some circumstances, even if the meeting itself will have no political purpose. Furthermore, as Mr. Gui also noted, at some point during 15 years of phone tapping a person is bound to let down his guard.

The IJ's finding with respect to phone tapping is tantamount to saying that someone who knows his phone to be tapped should forbear using the phone at all. Neither the government nor the IJ questioned Mr. Gui at any length about the content of the calls he believed were tapped. Mr. Gui merely indicated that questions police asked him led him to believe they had heard his conversations. There is no evidence on the record that any comments Mr. Gui made on the phone were "incriminating" at all—he only claims that interrogations led him to believe the police were eavesdropping.

We conclude that the IJ failed to provide the required "legitimate articulable" basis for disbelieving Mr. Gui's testimony concerning the phone tapping.

### Hit–and–Run Crashes

■ The IJ's disbelief of Mr. Gui's account of the hit-and-run crashes was particularly important to his adverse credibility finding. Both the government in its questioning and the IJ in his decision made much of the fact that Mr. Gui was only able to give the police descriptions of the faces of the drivers of the cars and, in the case of the second crash, also the license plate number. In its cross-examination of Mr. Gui, the government stressed how difficult it would be to find someone in a country of two million people based only on a description of his face. While Mr. Gui attempted to discuss what led him to believe the incidents were intentional—the fact that the drivers had followed him previously, the fact that there were no skid marks at the location of the accident when his stopped car was rear-ended, etc.—the INS attorney appeared to concentrate on Mr. Gui's failure as a detective, demanding, "[w]ell, then what else do you expect the police to do, if you go to the police station and you tell them—you give them a description of a person, you don't tell them who the person's name is, if you don't tell them anything else and then they can't help you? Is that political persecution in your opinion?" This line of questioning completely missed the point of Mr. Gui's testimony. He did not allege persecution because of the inability of the police to locate the hit-and-run drivers. Mr. Gui claims the hit-and-run accidents *themselves* are persecutory.

The IJ focused on the second accident, and the fact that there was a field where Mr. Gui was forced off the road. While the IJ is likely correct that being pushed off the road into a field might pose little danger, he ignored that fact that—in answer to the IJ's own question—Mr. Gui explained that his car stopped in a three-foot deep ditch that ran between the road and the field. Surely crashing into a three-foot deep trench poses danger of injury or worse.

The IJ further disbelieved Mr. Gui's account of the accidents because Mr. Gui is alive to tell about them. Ignoring Mr. Gui's repeated testimony that on several occasions officials tried to make him change his opinions and cease his political activities, the IJ seemed to assume that authorities wishing to silence a local activist would endeavor to do so only through means assured of killing him, such as running him off a cliff.[2]

The IJ's findings with respect to the accidents do not appear to have a "legitimate articulable basis," but instead appear based on the IJ's own opinions as to how best to silence a dissident. Mere injury, or implicit threats of murder through staged injurious accidents, are also effective ways to silence opposition.

### Romanian Government and Police Repressiveness

■ The IJ maintained that the Romanian government could not possibly be as repressive as Mr. Gui alleged because Mr.

---

**2.** It is hardly news that even repressive regimes balance the violence they commit against the potential for backlash. Machiavelli noted as much centuries ago: "Nevertheless a prince ought to inspire fear in such a way that, if he does not win love, he avoids hatred; because he can endure very well being feared whilst he is not hated ... But when it is necessary for him to proceed against the life of someone, he must do it on proper justification and for manifest cause." NICOLOMACHIAVELLI, THE PRINCE 24(W.K.Marriott, trans.), in GREAT BOOKS OF THE WESTERN WORLD (Robert Maynard Hutchins ed., 1952).

Gui is, in fact, still alive. The IJ concluded that a "truly repressive government" would not worry about questions arising should a dissident die. According to the IJ's logic, any asylum seeker who manages to stay alive long enough to get to the United States and file an application must not be subject to repression, since a truly repressive regime would have succeeded in killing the individual before she could leave.

We addressed a similar adverse credibility finding in *Lopez–Reyes v. INS*. There, the IJ found it "astonishing" that Lopez–Reyes had not been killed if it were true that he had been "chased by guerillas, shot at by guerillas, and beaten by the same guerillas." *Lopez–Reyes*, 79 F.3d at 912. We held that the IJ's conclusion was based on "personal conjecture about what guerillas likely would and would not do. Because conjecture is not a substitute for substantial evidence, we cannot uphold this finding." *Id.*

The *Lopez–Reyes* reasoning applies equally here. Furthermore, as Mr. Gui explained repeatedly, he was not a major national figure but a local activist. By his account, the police were trying to quiet him—not necessarily kill him—by use of threats, including his 24 hour 1991 detention, interrogation, and fine for "disturbing the public peace."

The IJ's disbelief of Mr. Gui on the grounds that the Romanian government must not be repressive because it merely harassed and threatened but did not kill him defies logic and does not provide a legitimate or cogent basis upon which to make an adverse credibility finding.

**1996 Letters**

 The IJ found it "extremely interesting" that the only two letters offered in support of Mr. Gui's application arrived in the spring of 1996 when his hearing was fast approaching. The IJ observed: "The

Respondent provided no other letter supporting his claim. Apparently the only letters he has received has [sic] occurred during the time he was place in deportation proceedings."

 This court has long held that, where allegations are otherwise unrefuted and credible, the IJ may not require corroboration of claims. *Ladha v. INS*, 215 F.3d 889, 899 (9th Cir.2000). Where, as here, a petitioner provides some corroborative evidence to strengthen his case, his failure to produce still more supporting evidence should not be held against him. Significantly, the letters in question were just two items in over 130 pages of supporting documents Mr. Gui provided with his asylum application. At no point did anyone question Mr. Gui about the dates of the letters or about whether they were the only ones he had ever received. The IJ provided no cogent basis upon which to conclude that they were anything but documentation of recent examples of the government's continuing harassment of his family; it certainly provided no articulable basis for believing that Mr. Gui had fabricated the letters, as the IJ implies.

**Mr. Gui's Education, Profession, and Wealth**

 Finally, the IJ found it "interesting" that Mr. Gui was educated at the expense of the Romanian government and permitted to work as a surgeon. The IJ maintained that if he were such a political threat, Mr. Gui would have been easy to fire from his position. Furthermore, the IJ noted that Mr. Gui owned two homes and a car and was wealthy by Romanian standards; if the government wanted to persecute him, the IJ reasoned, it would have confiscated his property.

The IJ failed to note that typically all education under Romania's Communist re-

gime was provided by the state. Thus the fact that Mr. Gui's education was state-funded is hardly a surprise. Furthermore, the fact that he was able to continue practicing medicine while politically active—leaving aside the fact that it is hardly novel to find members of the intelligentsia providing the voice of political dissent—militates if anything toward finding that Mr. Gui is credible. If his life was so comfortable in Romania—a car, multiple homes, a sizable income—why would he be so eager to leave? It was clearly not to advance his career: as he reported at his deportation hearing, Mr. Gui—a successful surgeon in Romania—had no license to practice medicine in the United States and had served for five years as a nurse's aide.

Any reason underlying an adverse credibility finding "must be substantial and bear a legitimate nexus to the finding." *Osorio*, 99 F.3d at 931(internal quotation marks and citations omitted). The opinions the IJ offers in this regard do not satisfy that standard.

&ast; &ast; &ast; &ast; &ast; &ast;

For the foregoing reasons, we reverse the IJ's adverse credibility finding. The IJ failed to demonstrated that he had "a legitimate articulable basis to question the petitioner's credibility." *Osorio*, 99 F.3d at 931(internal quotation marks and citation omitted). Nor did he offer "a specific, cogent reason" for his stated disbeliefs. *Id.* Furthermore, those reasons he did offer were insubstantial and did not "bear a legitimate nexus to the finding." *Id.* Instead, the IJ offered his own conjecture, which "is not a substitute for substantial evidence" and should not be credited by this panel. *Lopez–Reyes*, 79 F.3d at 912.

*Asylum Eligibility*

We review factual determinations underlying the BIA's denial of asylum under the substantial evidence standard. *INS v. Elias–Zacarias*, 502 U.S. 478, 481,

112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Thus, we reverse an adverse asylum determination if it is not supported by reasonable, substantial, and probative evidence in the record. *Id.*

The Attorney General may grant asylum to an applicant who qualifies as a "refugee," defined as one who refuses to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Persecution is "the infliction of suffering or harm upon those who differ ... in a way regarded as offensive." *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997) (ellipses in original) (quoting *Sagermark v. INS*, 767 F.2d 645, 649 (9th Cir.1985)).

To establish a well-founded fear of persecution, petitioners must show that their fears are "both objectively reasonable and subjectively genuine." *Ladha*, 215 F.3d at 897(internal quotation marks and citation omitted). "An alien satisfies the subjective component by credibly testifying that he genuinely fears persecution." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir.1999). Mr. Gui has done so here. One way in which he may satisfy the objective component is to demonstrate past persecution, which triggers a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i); *Agbuya v. INS*, 241 F.3d 1224, 1228 (9th Cir.2001). The INS can rebut this presumption by showing by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 208.13(b)(1)(i)(A).

■ Here, Mr. Gui provided his own compelling testimony, consistent and believable and unrebutted, of the past persecution that has put him in fear of persecution were he to return to Romania. He has also provided corroborative evidence. Mr. Gui asserts that the wiretapping, hit-and-run attempts to injure or kill him, detention, interrogation, and warrantless searches he has suffered, taken together, constitute past persecution.

■ To demonstrate past persecution, threats alone are typically insufficient but are instead evidence probative of the reasonableness of a fear of future persecution. *Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000). Certain of the ills Mr. Gui has suffered—specifically the searches, interrogations, and phone taps—could be construed as threats and harassment rather than an actual infliction of suffering or harm. The staged car crashes, on the other hand, put Mr. Gui at serious risk of injury or death, in one case ramming his car hard enough to throw it onto a train track, and in the other sending the vehicle careening into a three foot ditch. The fact that Mr. Gui did not in fact die or suffer serious injury in these car accidents should not mitigate the severity of the acts. Had he been maimed in the accidents, persecution would be established easily; the fact that he was not should not lessen the responsibility of his assailants or reduce the reasonableness of Mr. Gui's fear that he may not be so lucky the next time he takes to Romania's roads.

Relying on his credible testimony, we find that Mr. Gui has established past persecution. Therefore, we presume he has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i); *Agbuya*, 241 F.3d at 1228 (9th Cir.2001). The government may rebut this presumption with proof of a change in country conditions by a preponderance of the evidence. 8 C.F.R. § 208.13(b)(1)(i)(A).

■ We review the BIA's factual finding as to country conditions for substantial evidence.[3] *Hernandez–Montiel v. INS*, 225 F.3d 1084, 1090 (9th Cir.2000). Therefore, we will uphold the BIA's determination if it is supported by reasonable, substantial, and probative evidence on the record. *Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812 In its decision, the BIA simply stated conclusorily—citing no evidence—that "evidence of record establishes that country conditions have changed to such an extent that any fear the respondent may have had of returning because of his prior anti-government activities should be significantly diminished." The BIA's decision did not represent the kind of individualized analysis this court has required to refute a presumption of a well-founded fear. *Osorio*, 99 F.3d at 932–933 (citing *Berroteran–Melendez v. INS*, 955 F.2d 1251, 1257 (9th Cir.1991)). The INS points only to a February 1995 Department of State Country Report on Romania. That report—now seven years old—noted that "police continue to use excessive force during arrest and to beat detainees." Department of State, Country Report: Romania (Feb.1995). While the INS cites to the report's finding that "[t]here were no reports of political or other extrajudicial killings" in 1994, this is hardly sufficient to establish, by the preponderance of evidence that 8 C.F.R. § 208.13(b)(1)(i)(A) requires, that conditions have changed so much that Mr. Gui no longer has a well-founded fear of persecution. The government has therefore failed to rebut the presumption that Mr. Gui has a well-founded fear of persecution should he return to Romania.

---

**3.** The IJ decision made no mention of country conditions in Romania.

Having found that Mr. Gui demonstrated past persecution and that the government has failed to rebut the presumption of a well-founded fear of future persecution, Mr. Gui is statutorily eligible for asylum. The Attorney General should exercise his discretion with respect to whether or not to grant Mr. Gui such relief. 8 U.S.C. § 1158(b)(1).

*Withholding Deportation*

■ While asylum is discretionary, a petitioner is entitled to withholding of deportation "if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country." *Ladha*, 215 F.3d at 897 (internal quotation marks and citation omitted). A petitioner must show it is "more likely than not that he will be persecuted on account of one of the five enumerated factors were he to return." [4] *Id.* If a petitioner meets this high standard, the Attorney General must grant withholding of deportation. *Id.*

■ In light of the long passage of time and indications that Romania's political terrain may indeed be different than it was in 1991 when Mr. Gui left, he cannot demonstrate that there is a clear probability that his persecution would resume were he deported. Although Mr. Gui's fear is well-founded, he is not able to demonstrate that it is more likely than not that he will be persecuted based on his political beliefs should he return to Romania. We therefore deny his request for withholding of deportation.

*Request for Remand for Consideration Under the U.N. Torture Convention*

■ The BIA denied Mr. Gui's motion to reopen his case in light of the United Nations Convention Against Torture. We

review a BIA decision denying an applicant's motion to reopen for abuse of discretion. *Garcia v. INS*, 222 F.3d 1208, 1209 (9th Cir.2000).

Under the Convention's implementing regulations, torture is defined as:

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). An applicant must demonstrate that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal."

■ While the persecution Mr. Gui suffered in Romania was serious, it did not amount to torture. The BIA did not abuse its discretion in refusing to reopen Mr. Gui's case for consideration under the Torture Convention.

**CONCLUSION**

Mr. Gui is eligible for asylum. We remand to the BIA for an exercise of discretion by the Attorney General with respect to whether or not Mr. Gui's asylum request should be granted. Mr. Gui is not eligible for withholding of deportation. Finally, the BIA did not abuse its discretion in denying Mr. Gui's motion to reopen his proceedings for consideration under the

---

4. The five factors are race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A).

United Nations Convention Against Torture.

**PETITION GRANTED IN PART. PETITIONER IS ENTITLED TO COSTS.**