**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAHA GEORGE MOUSA,
                    *Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,

                    *Respondent.*

No. 04-75998

Agency No.
A78-542-049

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued October 16, 2007
Submitted June 27, 2008
Pasadena, California

Filed June 27, 2008

Before: Harry Pregerson, Michael Daly Hawkins, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Pregerson

**COUNSEL**

Douglas D. Nelson, Alejandro O. Campillo, A.P.L.C., San Diego, California, for the petitioner.

Sara Winslow, United States Attorney's Office, San Francisco, California, for the respondent.

**OPINION**

PREGERSON, Circuit Judge:

Maha George Mousa ("Mousa"), a native and citizen of Iraq, petitions for review of the Board of Immigration

Appeals' ("BIA") order that denied her application for asylum and withholding of removal.[1] We have jurisdiction under 8 U.S.C. § 1252, and we grant Mousa's petition.

## BACKGROUND

Mousa is a Chaldean Christian who lived in Iraq before fleeing to the United States in 2001. She testified at a hearing before the IJ held on April 8, 2003, that she and her family members suffered multiple incidents of abuse at the hands of Ba'ath party officials. Specifically, she testified that for years she had been harassed and pressured to join the Ba'ath party, and that she and her brother were imprisoned in a Ba'ath party compound for forty-seven days because they resisted joining the party. She also testified that she was raped during her imprisonment.

The IJ did not find Mousa credible. The IJ also held that, even if Mousa were credible, the fall of Saddam Hussein would change circumstances in Iraq to such an extent that Mousa would no longer have a well-founded fear of future persecution. The BIA adopted the IJ's decision in its entirety, citing to *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994). *See Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc) (explaining that "where the BIA cites its decision in *Burbano* and does not express disagreement with any part of the IJ's decision, the BIA adopts the IJ's decision in its entirety"). The BIA also added its own analysis of Mousa's claims. Accordingly, we review both the IJ's and the BIA's decisions. *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2000).

---

[1]Mousa concedes that she is not eligible for relief under the Convention Against Torture.

## DISCUSSION

### I.   Asylum Claim

#### A.   Credibility Determination

We first examine the record to determine whether substantial evidence supports the IJ's adverse credibility determination. *See Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). The IJ began his adverse credibility analysis by noting that he was "in no way stating that [Mousa] ha[d] given [him] false testimony." Instead, the IJ was concerned with certain discrepancies in Mousa's testimony. After careful review, we conclude that none of these purported discrepancies warranted an adverse credibility finding.

[1] First, the IJ could not reconcile Mousa's years of resistance to joining the Ba'ath party with the Ba'ath party's reputation for ruthless recruitment tactics. The IJ reasoned that a young woman like Mousa would have had a difficult time withstanding extreme pressure to join the Ba'ath party. We have previously held, however, that a petitioner's ability to withstand severe persecution does not make it less likely that such persecution occurred. *See Gui*, 280 F.3d at 1226-27 ("According to the IJ's logic, any asylum seeker who manages to stay alive long enough to get to the United States and file an application must not [have been] subject to repression, since a truly repressive regime would have succeeded in killing the individual before she could leave."). That Mousa resisted joining the Ba'ath party does not mean she was not pressured by the Ba'ath party. Moreover, the IJ conceded that this discrepancy alone would not be enough to support an adverse credibility determination. Accordingly, we hold that the IJ's speculation about Mousa's ability to resist the Ba'ath party's pressure on her to join its ranks was not supported by substantial evidence. *See Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000) ("Speculation and conjecture cannot form the basis of an adverse credibility finding. . . .").

**[2]** We also reject the IJ's and BIA's primary reason for finding Mousa incredible: Mousa's failure to mention her rape at an earlier stage in the immigration proceedings. We have previously held that "the assumption that the timing of a victim's disclosure of sexual assault is a bellwether of truth is belied by the reality that there is often delayed reporting of sexual abuse." *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052-53 (9th Cir. 2002) (concluding that the failure to report a sexual assault in two asylum interviews did not support an adverse credibility finding); *see also Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) ("A victim of sexual assault does not irredeemably compromise his or her credibility by failing to report the assault at the first opportunity."). Many victims of sexual assault feel so upset, embarrassed, humiliated, and ashamed about the assault that they do not tell anyone that it occurred. *See, e.g.*, *Paramasamy*, 295 F.3d at 1053 n.3 (citing studies that analyze the extreme under-reporting of sexual abuse). A woman who has suffered sexual abuse by government officials in her home country may be especially reluctant to reveal that abuse to government officials in this country, even when such a revelation could help her asylum application. *See id.* at 1053. This is especially true when the woman is fleeing a country where reported rapes often go uninvestigated, and where rape victims are sometimes murdered by members of their own families because they have "dishonored" their families by being raped.[2]

**[3]** In this case, Mousa did not explicitly report that she was

---

[2]*See, e.g.*, European Council on Refugees & Exiles, *Guidelines on the Treatment of Iraqi Asylum Seekers and Refugees in Europe*, 18 Int'l J. Refugee L. 452, 458 (2006) (explaining that "[d]ue to the increasing influence of strong conservative, religious groups, the situation for women [in Iraq] has worsened. There is evidence of physical force (murder, rape, kidnappings, domestic violence, 'honour killings')"); *id.* at 458 n.31 ("In the case of northern Iraq it has also been reported that cases of honour killings and other criminal offences against women are on the increase and not investigated by the Kurdish authorities."). We note that Mousa's family is from Alqosh, a small town in northern Iraq.

raped until she testified before the IJ. However, like the petitioner in *Paramasamy*, Mousa provided a compelling explanation for her failure to mention her rape at an earlier time in the proceedings: her cultural reluctance to admit the fact that it had occurred.[3] *See id.* (noting that "Paramasamy provided a strong, unrebutted explanation for her reluctance to reveal details — her cultural reluctance to tell male interviewers that she had been violated."). That Mousa, a Chaldean Christian woman from Iraq, was not forthcoming with details about her rape is hardly an irreconcilable problem with her asylum application.

[4] Moreover, Mousa *did* mention rape in her written asylum application. Mousa wrote that she feared being raped if she returned to Iraq, and that Iraqi government officials routinely rape and torture women who are detained. Mousa also submitted her brother's asylum application in support of her case. In his application, Mousa's brother stated that the Ba'ath party officials had touched Mousa "in inappropriate places." The IJ reasoned that Mousa's willingness to discuss her general fear of rape did not "fit" with her reluctance to discuss her own rape. To the contrary, her fear about being raped if she returned to Iraq is consistent with having been sexually abused herself.[4]

---

[3]On cross-examination, Mousa was asked why she wrote in her asylum application that "the government officials routinely rape and torture women who are detained" without mentioning her own rape. Mousa replied, "This is a personal thing, I really didn't want to mention it. I'm forced now to talk about it. And, and through our family tradition this is a big taboo." She explained further that "this is a very shameful thing for a woman. It's a very personal thing, I didn't want to speak of it at all. They told us, you do not speak of this anymore, that's why I didn't say anything." When asked again why she mentioned rape generally but did not talk about her own rape, Mousa replied, "I didn't want the attorney, I didn't want the translator, I didn't want anybody to know anything like this about me. Throughout our C[h]aldean community I didn't want anybody to know of it."

[4]The government did not offer any evidence to rebut Mousa's cultural reluctance to report her rape.

Both the IJ and the BIA also focused on a purported discrepancy between Mousa's testimony and her brother's testimony regarding her rape. During the hearing before the IJ, Mousa explained that she had not wanted to tell anybody that she had been sexually assaulted. Later in the hearing, her brother testified that Mousa had eventually told him that she had been raped. He also stated that he had communicated this information to their attorney.

After comparing these statements, the BIA concluded that Mousa's reluctance to discuss her rape with her attorney was contradicted by her brother's testimony. That *Laith* eventually told the attorney that his sister had been raped, however, does not conflict with *Maha*'s testimony that she herself did not want the attorney to know about this incident. To reach its contrary conclusion, the BIA must have assumed that Mousa encouraged her brother to disclose the rape to the attorney. There is, however, no evidence supporting this, and there is no reason to assume that Mousa was lying when she testified about her efforts to keep the rape from her attorney.

It would also be improper for the IJ and the BIA to penalize Mousa for her counsel's failure to disclose the rape before the hearing — either in Mousa's written asylum application or in her pre-hearing statement. To do so would rely on the unsupported assumption that Mousa's counsel knew all the details of her rape before preparing these documents. It also would assume that Mousa had given her attorney permission to disclose the rape once he learned the details. At oral argument, Mousa's counsel explained that this was not the case. Because Mousa understandably did not want anyone in the Chaldean community to know the details of her rape, she told her attorney only that her persecutors had "abused me repeatedly with their hands." Her attorney included that statement in her asylum application, along with her brother's application, which reported that Mousa had confessed that "they touched her in inappropriate places." This was, as far as anyone knows, the extent of the attorney's knowledge. Under these circum-

stances, we conclude that the IJ's and BIA's speculation about how Mousa's counsel should have handled her case is an improper basis for denying her asylum claim.

**[5]** We conclude that Mousa offered a credible explanation for her reluctance to talk about her rape and we therefore hold that her testimony about her rape could not support the IJ's and BIA's adverse credibility finding.

The IJ's final reason for finding Mousa incredible was her failure to explain the consequences of a leg infection she had suffered while imprisoned. However, Mousa testified about this leg infection only in passing. She was never asked to discuss the seriousness of the infection or how she had recovered from it. Her failure to discuss the infection in detail cannot support the IJ's adverse credibility finding. *See Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000) ("[T]he mere omission of details is insufficient to uphold an adverse credibility determination.").

**[6]** Because each of the reasons supporting the adverse credibility determination fails, we hold Mousa's testimony to be credible. *See Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004) ("[W]hen each of the IJ's or BIA's proffered reasons for an adverse credibility finding fails, we must accept a petitioner's testimony as credible.").

B.   Changed Country Conditions

**[7]** We now turn to the alternative holding that changed country conditions — namely, the fall of Saddam Hussein and the Ba'ath party — were a basis for denying Mousa's application. This alternative holding assumed arguendo that Mousa established past persecution. When the petitioner establishes past persecution, the government bears the burden of establishing that changed country conditions have removed the petitioner's presumptive well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1)(ii). We review factual find-

ings regarding changed country conditions for substantial evidence, *Lopez v. Ashcroft*, 366 F.3d 799, 805 (9th Cir. 2004), and conclude that the government failed to meet its burden.

[8] Here, the government submitted a single *Washington Times* article, titled "Strike targets Saddam," as its evidence of changed country conditions.[5] Published on April 8, 2003 — the date of Mousa's hearing before the IJ — the article merely described the coalition attacks on Iraqi intelligence headquarters in Baghdad. The article in no way suggested that Chaldean Christians would be safe from religious persecution in Iraq as a result of the coalition's efforts to remove Saddam Hussein from power. Because the government's evidence hardly could have provided the IJ with the ability to determine how any potential changes in Iraq would eliminate Mousa's well-founded fear of future persecution, we hold that the government failed to meet its burden on rebuttal. Accordingly, we reverse the finding that changed country conditions have removed Mousa's well-founded fear of future persecution. *See Hanna v. Keisler*, 506 F.3d 933, 938 (9th Cir. 2007) (reversing a changed country conditions finding where the "government did not make any showing whether [petitioner] would likely fear religious persecution from others in a post-Saddam Hussein Iraq").

---

[5]The IJ also refers to an unidentified "Department of State report" in support of his assertion that "Christians have been permitted to pursue their religion and that in Iraq the problems that exist is [sic] a function of politics and not necessarily a difference between Christians and Muslims in general." Our review of the record reveals that the only State Department reports in evidence were submitted by Mousa, not the government. Contrary to the IJ's assertion, these reports consistently indicated that the Iraqi government had engaged in significant abuses against the country's Chaldean Christian population. The reports do not support the IJ's conclusion that political changes in Iraq would eliminate Mousa's well-founded fear of persecution.

## II.   Withholding of Removal

**[9]** Finally, the IJ and BIA denied Mousa's claim for withholding of removal. As with asylum, a petitioner can generate a presumption of eligibility for withholding of removal by showing past persecution. 8 C.F.R. § 1208.16(b)(1)(i); *see Baballah v. Ashcroft*, 367 F.3d 1067, 1079 (9th Cir. 2004). This presumption may be rebutted only if the government shows a fundamental change in circumstances or shows that the applicant could reasonably relocate within the country of that person's nationality. 8 C.F.R. § 1208.16(b)(1). As discussed above, the government did not provide reliable evidence of a fundamental change in circumstances in Iraq. Moreover, nothing in the record indicates that Mousa could reasonably relocate within Iraq. Accordingly, we reverse the denial of Mousa's claim for withholding of removal and remand for consideration of past persecution on the merits. *See Hanna*, 506 F.3d at 940.

## CONCLUSION

For the reasons stated above, we grant the petition for review and remand Mousa's asylum and withholding of removal claims to the BIA to determine whether, accepting her testimony as true, she has established past persecution and is eligible for relief. *See INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (holding that "a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands").

**PETITION GRANTED.**