BEA, Circuit Judge,
dissenting in part and concurring in part:[1]
I respectfully dissent. The BIA accepted the IJ’s adverse credibility finding (“ACF”), which rested upon five purported inconsistencies and omissions in petitioner’s testimony. Because the majority affirms as to only one of those purported inconsistencies, I will not address the rest. *742 I conclude, however, that the IJ did not base her ACF upon “substantial evidence,” but rather upon her own misunderstanding of petitioner’s attorney’s non-chronological questions and of the plain words of petitioner’s answers. That is, the IJ offered no “legitimate articulable” basis or “specific cogent reason” for her decisions, Gui v. I.N.S., 280 F.3d 1217, 1225 (9th Cir.2002), and I would therefore reverse and remand with instructions to find petitioner credible.
“Jail” cell versus “interrogation” room.
The IJ cited a supposed inconsistency between petitioner’s asylum application declaration and her live testimony. In her asylum application declaration, petitioner said she had been kicked and slapped by Chinese police in an interrogation room. The BIA accepted the IJ’s finding that petitioner mentioned in live testimony only being forced to read government newspapers until she was “reminded” about the physical abuse—even after being asked twice “did anything else happen?”
But the record shows that the BIA and IJ’s conclusions were not products of “specific cogent” or “legitimate” reasoning based on what was actually asked and answered at the hearing. Gui, 280 F.3d at 1225; Zi Lin Chen v. Ashcroft, 362 F.3d 611, 617 (9th Cir.2004). Bear with me while the scene is reconstructed from the record, then judge for yourself.
For eight pages of the record petitioner gave detailed testimony about her conversion to Christianity and her religious activities in China. At length, her attorney turned to January 16, 2005, when petitioner’s underground house church in Jilin Province was raided by about fifty police officers. Petitioner’s attorney began the following line of questioning:
Q. How many of you were arrested?
A. About 20 people.
Q. Okay, where did, did they take you? A. To police station.
Q. Okay, and how long were you detained at the police station?
A. For about 17 days.
Q. Okay. During these 17 days, did police ever interrogate you?
A. Yes.
Q: How many times?
A: Once.
Q: Okay. Besides interrogating you, did police do, did anything to you during these 17 days?
A: Yes.
Q. What did they do?
A. They forced me to read [a] government newspaper.
(Emphasis added). Then petitioner’s attorney asked her “Okay, what else?” and she responded that she was forced to write reports about the newspapers under threat that her parents would be arrested if she did not. Her attorney then asked “Okay. Anything else happen?” and she responded “no.”
At that point her attorney said “But on your statement you say that they kicked you.”[2] The court asked petitioner to explain: “Ma’am, your testimony is inconsistent with your declaration. Why is that?” Petitioner answered: “I believe that it is consistent. In what way?” The IJ responded:
You just told me that they forced you to read a paper, they threatened to arrest your parents and they forced you to write a report and that nothing else happened. The inconsistenc[y] is because your statement says that you were *743 beaten. Now why did you fail to mention that in your testimony?
Petitioner replied: “[b]eeause I, I understood that my attorney asked me before I went to jail why, why [while, while], I was interrogating, what kind of thing happened, I understood that way. That’s why I mentioned that.”[3]
The IJ’s response to that is puzzling: “No, because you testified that you had been forced to read a paper, that you had to write reports, so your testimony indicates you understood the scope of the question.” But, as petitioner explained,
So why [while] I was in the jail and they forced me to read a paper, but before I went to jail, while they were interrogating me, and they beat me. Because as soon as I arrive in the police station they took me to the interrogating room and then they started interrogating me. At that time, the police officer beat me. Because my attorney just asked me that, ivhat kind of a thing happened in the jail that’s why I just mentioned that part right now. (Emphasis added).[4] No wonder petitioner “just mentioned that part right now”; remember, the “scope of the question” had been:
Q. Okay. During these 17 days, did police ever interrogate you?
A. Yes.
Q: How many times?
A: Once.
Q: Okay. Besides interrogating you, did police do, did anything to you during these 17 days?
The substance of the testimony was clear. Petitioner had been beaten during her one interrogation, in the interrogation or “interrogating” room. After that, she was jailed for seventeen days and made to read government newspapers and write reports—and nothing else happened during the seventeen days.
What specific, cogent, articulable basis did the IJ have for her conclusion in her oral opinion that petitioner, even when asked “anything else,” “omi[tted]” mention of beatings until “reminded?” It can only be that petitioner answered her attorney’s questions precisely as, and in the order that, they were presented to her. I am quite sure it is not the law of this circuit to fault asylum petitioners and label them not credible for answering their attorneys’ questions as asked. And the attorney’s meandering questions are not “substantial evidence” of petitioner’s credibility—if anything, petitioner’s precise and unen- *744 hanced answers to her attorney’s precise questions demonstrate her “candor” and “responsiveness,” two of the factors an IJ should consider in an ACF determination under the REAL ID Act. 8 U.S.C. § 1158(b)(l)(B)(iii).
Indeed, once petitioner’s attorney backtracked his questions to the interrogation that he had leapt entirely over in his first line of questioning, and posed the non-leading question “Okay, why don’t you tell us then what happened in the interrogation room,” petitioner testified consistently with her declaration in describing her physical abuse. She stated that she was slapped, accused of anti-government illegal activities, and was threatened with “jail” if she did not confess. With no further prompting from her attorney, she then described in detail how she was “hit” with a leather boot in her lower back and legs until she fell to the ground and lost consciousness. She admitted that after she fell down, “nothing else happened.” She said that when she woke up she was in a cell with five other people, and was so bruised that she asked for medical attention, but was refused.
Her live testimony was compelling and consistent with her declaration, in which she averred she was arrested, then first taken to an “interrogation” room, where she was slapped, accused of anti-government illegal activity, and then kicked with shoes until she “passed out.” When she woke up, she wrote, she was “in a cell” in great pain and “barely able to move.” Only “[thereafter,” she wrote in her declaration, was she forced to read newspapers and write reports. (Emphasis added). The IJ, however, took no note of that consistency between the declaration and the testimony, in disregard of “the totality of the circumstances approach” of the REAL ID Act that “imposes the requirement that an IJ not cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result.” Shrestha v. Holder, 590 F.3d 1034, 1040 (2010).
The majority asserts that I merely credit Jiang’s testimony more than the IJ did, as though on de novo review, that my interpretation is merely one “feasible” view of the testimony among many, and that nothing compels my contrary conclusion, as the REAL ID Act requires. Not so: the words compel my conclusion. Words matter.[5] Petitioner was asked a question composed of words: what did the authorities do “besides interrogate] you? ” The later words “anything else?” had as their plain antecedent the initial words “Besides interrogating you, did police do, did anything to you during those 17 days?” After relating that she had to read government propaganda and write reports, the only truthful, accurate response petitioner could give to the words “besides,” “anything,” and “else,” no matter how many times the words were repeated, was “no.”
Indeed, the BIA’s use of “detention”[6] and the IJ’s use of “jail” showed that neither paid precise attention to the words that described events that took place in (1) the interrogation room—interrogation and beating when petitioner would not sign a *745 “confession,” and (2) the jail cell—where the petitioner was made to read government propaganda and write reports. Similarly, the BIA noted that the IJ “thought it significant that [petitioner] finished testifying about these events and was asked if anything else happened to her, to which she responded [n]o.” The record shows otherwise. Petitioner was not “finished” testifying about what happened to her: she had not yet been asked about the “interrogation.” Petitioner’s attorney simply skipped from the questioning in the interrogation room to the forced reading and writing in the jail cell, without asking about the beating that took place in the interrogation room. I do not consider reasoning based on the erroneous interpretation of plain words, particularly words with meanings consistent with petitioner’s declaration, to be “substantial evidence,” based on “specific, cogent,” or “legitimate” reasons, that can support an ACF. Gui, 280 F.3d at 1225.[7] And without that reasoning, petitioner’s testimony was nothing but consistent and compelling.[8] Kin v. Holder, 595 F.3d 1050, 1054 (9th Cir.2010). I would therefore reverse and remand with instructions to find the petitioner credible, and I respectfully dissent.

. I concur in that part of the majority's decision that finds that the IJ showed no prejudice that made the proceeding fundamentally unfair.

. This apparently was when petitioner was "confronted” with her declaration, as the IJ characterized the testimony in her oral opinion.

. The government calls this explanation "incomprehensible] and confusing[ ]." Any confusion is likely attributable to the translator, Ms. Lee, who clearly meant "while” where the transcriber heard “why”; Ms. Lee’s English was poor and her accent very thick. See, e.g., "If you believe in God, you’re going to be more comfortable feeling in your mind.”; "Because at that time, police officer told us that he writes this to illegally, he writes this gathering illegally, they said.”; "Q. Are you employed, sir? A. Yes. I am running toying company. JUDGE TO MS. LEE: A toy company? MS. LEE TO JUDGE: Toying. JUDGE TO MS. LEE: Coin? MR. IM TO JUDGE: Toying. MS. LEE TO JUDGE: Toying. Toying company. JUDGE TO MR. IM: Towing vehicles? A. Yes.”
This circuit has warned that "faulty or unreliable translations can undermine evidence on which an adverse credibility determination is based.” He v. Ashcroft, 328 F.3d 593, 598 (9th Cir.2003).

. The interrogation room, jail, police station, and cell all were part of the same building complex, but were separate areas. Petitioner's attorney asked her:
Q. Okay. So where were you interrogated?
A. In interrogating room, [sic]
Q. And that interrogating room is not part of the jail?
A. It’s part of police station and jail, but I, I just understood that you just asked me why [while] I was in the jail, inside of the cell, [sic]

. I recall an exchange from A Man for All Seasons:
MORE: (Very still) What is the oath?
ROPER: (Puzzled) It’s about the marriage, sir.
MORE: But what is the wording?
ROPER: We don't need to know the (Contemptuously) wording—we know what it will mean!
MORE: It will mean what the words say! An oath is made of words!
Robert Bolt, A Man for All Seasons, Act II, 74-75 (Heinemann, 1960).

. A word not used during the IJ hearing testimony.

. See also Chengjun Wu v. Holder, 434 Fed.Appx. 592 (9th Cir.2011). In that case, the IJ found petitioner not credible because of an “inconsistency” between petitioner’s written declaration and her testimony. In her written application, petitioner wrote she had a forced abortion and an IUD implanted in 1985. Id. at 593. The IUD caused complications, was removed, petitioner became pregnant again in 1994, and was forced to have a second abortion. At the IJ hearing, petitioner was asked if she had the abortion and IUD put in on the same day. Petitioner, through a translator, testified that she was forced to have the first abortion and then “immediately” had the IUD implanted. Id. Petitioner later "clarified” the IUD was put in “the ‘second time’ ” “after she ‘went back to the hospital’ ” because she was in pain from the abortion. Id. The IJ, however, interpreted the word "immediately” to mean that the IUD was put in the “same day” as the abortion. The IJ interpreted the clarifying words "second time” to mean the "second abortion,” and found the petitioner not credible because the words were inconsistent with the declaration and because "immediate! ]” implantation of an IUD after an abortion is medically out of the question. Id. at 594. The panel, however, granted the petition for review and remanded with instructions to find petitioner credible, and concluded that the IJ’s interpretations of the words of petitioner’s testimony did not constitute substantial evidence: “[t]he IJ’s strained interpretation of Wu’s testimony is based entirely on ambiguity in the word 'immediately,' but Wu’s meaning was made clear by her subsequent testimony ... Basing an adverse credibility determination on an applicant's fine-grained word usage is particularly inappropriate in cases, such as this, where there is an obvious language barrier.” Id.

. Petitioner’s testimony was also consistent with the State Department's 2005 report on the persecution of house churches in China, including in petitioner’s native Jilin Province:
Protestant house churches and their leaders were subject to a selective crackdown in many areas. Authorities frequently disrupted house church meetings and retreats and detained leaders and church members. In May authorities reportedly detained hundreds of house church members from different groups in Jilin Province.... On August 2, authorities reportedly abused some of 40 worshipers detained in Hubei Province's Zaoyang City. On August 7, a house church in Hejing County, Xinjiang Province, was reportedly raided and several worshipers were detained.
Evidence from the State Department is one of the enumerated factors under the REAL ID Act that can show the credibility of a petitioner's testimony. 8 U.S.C. § 1158(b)(1)(B)(iii). See also Ren v. Holder, 648 F.3d 1079, 1089 (9th Cir.2011) (State Department evidence supported petitioner’s claims that he was persecuted as part of a Chinese Christian house church).