**Ranjeet KAUR, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–72302.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2003.

Filed Aug. 19, 2004.

---

Earle A. Sylva, Rai Law & Associates, San Francisco, CA, Rohit Dharwadkar, Law Offices of Hardeeep Singh Rai, San Francisco, CA, for the petitioner.

Ronald E. LeFevre, Office of the District Counsel, San Francisco, CA, Richard M. Evans and Joan E. Smiley, Office of Immigration Litigation, Washington, DC, for the respondent.

Before: CANBY, W. FLETCHER, and TALLMAN, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

Ranjeet Kaur petitions for review of a decision of the Board of Immigration Appeals ("BIA") upholding the Immigration Judge's ("IJ") denial of her application for asylum and withholding of removal, and denial of her motion to remand to the IJ to apply for relief under the Convention Against Torture ("CAT"). Because we find that the BIA's asylum decision was not based on substantial evidence, we grant the petition and remand to the BIA for proceedings consistent with this opinion.

## I. Background

Ranjeet Kaur is a Sikh and a native and citizen of India. She entered the United States illegally in July 1996 and was placed in removal proceedings the following year. After admitting removability, Kaur filed for asylum and withholding of removal. She testified before the IJ that in 1995 she was imprisoned, beaten, and raped in India because the police wrongly imputed her father's alleged connections to Sikh militants to her. The IJ denied Kaur's application for asylum and withholding of removal because he found that her testimony was not credible. The BIA affirmed the IJ's credibility finding. It held, further, that even if Kaur were found to be credible, the weaknesses in her testimony were such that the testimony was insufficient to carry her burden of proof without corroborating evidence, which she had failed to provide.

Kaur testified that her family had a large farm of 80 acres in India. She testified on direct examination that in May 1993, Sikh "militants" or "terrorists" came

to her family's home at six o'clock in the evening and demanded the family's jeep. Kaur was in the kitchen, preparing food. After her father told the militants that her uncle had taken the jeep, one of them became angry, showed his pistol and said, "in case you try to be cle[ ]ver, we are going to kill all of your family." Kaur's father offered the militants his tractor instead. "Then they said along with the tractor we need some money also."

Kaur testified that her father "went inside and suddenly I heard—I heard shots being fired. . . . When we heard the sound of firing, the militants got nervous and they (indiscernible) back. When after that my father came out, he had his license gun with him. When they saw that gun with my father, they started fighting [sic]." "Thereafter my father also started firing as others were fighting [sic] and while fighting [sic] he went out. They went out. Canal which flows in front of our house which is very close by, there's no water that time, they crossed through that dry canal and then left."

Toward the end of the hearing, the IJ asked Kaur about this episode:

Q [by the IJ]: Now, the gunshots that you say you heard that apparently scared the militants, where did those gunshots come from?

A: From inside.

Q: Inside where?

A: From inside the room. Because my father had gone inside the room.

Q: Inside what, his bedroom?

A: Yes.

Q: So, are you saying that your father fired the shot inside his room?

A: Yes. My father fired the shots.

Q: Where is your father's bedroom? Is it in the front of your house or the back of your house?

A: As we enter the house, it's on one side.

Kaur testified on direct examination that after the militants left, her father went onto the roof of their house to tell the neighbors what had happened. "And to that, they also came up on the roof and offered to help us all saying that we will be together and we'll sleep on the roof today. And thereafter, we had our meals, they slept on the roof. We slept in our house. They also had weapon, gun. They took it along with them."

During cross-examination, Kaur explained further:

A: . . . . He went up the stairs within the house and from the roof called adjourning [sic] neighbors. The roofs are— both the roofs are joined with each other. From there, he met the neighbors.

Q: So, he wasn't afraid to go and place himself on the roof of his home, exposing himself to anybody hiding outside with a gun, shouting to the neighbors saying, militants came to my house? Is that what you're saying?

A: It was not like that. It is the normal way of our living that you go over the roof and joining with the other houses. You could go down from there. There's no shouting for neighbors. Went and spoke to them.

* * *

Q: Did your neighbors have guns, too?

A: Yes, they have.

Q: And so your neighbors heard the gunshots that your father and the militants exchanged?

A: I'm not sure but they must have heard because the firing shots are heard quite a distance.

Q: And are you testifying that your father then in the middle of the night after gunshots are exchanged crawls

down his neighbor's roof into his neighbor's home unexpected?

A: The way we have relationship with neighbors in India, we can go like that and the house was joining with each of the—it was exposing yourself anywhere.

Kaur testified that the police came to their home at five or five-thirty the next morning to arrest her father. On cross-examination, when asked how she remembered what time the police had come to her home, Kaur stated: "The events or incidents which have happened with you, you remember those. It was the first time such incident had happened in my life." After her father was later released, Kaur learned that the police had thought he was linked to the militants:

When he came after (indiscernible) to home, he told me that whenever they are beating him or torturing him, they are telling him that Goodeev [ ] Singh has stole—that Goodeev Singh has told them that terrorists came to your house. After having left that place they went and killed a Hindu. As police blamed him and charge him that you help the terrorist and you have joined with them.

Kaur testified that the police held her father for five days. He was released after a bribe was paid.

In October 1995, about a year and a half after her father was arrested, an event was organized in Kaur's village to commemorate the death of two boys who had been killed by police in 1991. Kaur explained how her father, like others at this commemoration, spoke about his own treatment at the hands of the police:

During the speeches, various speakers said how (indiscernible) police first kills innocent people and then tells that they have been killed through their personal enemy. Then they implicate or blame these innocent people that they still give shelter to terrorist and feed them, but that thing was not happening there at all. Then my father also give a lecture giving to his own experiences how he had been tortured and falsely implicated by the police and that he said that I was beaten like this and I was falsely implicated.

After Kaur's father delivered his speech, he left the village to visit Kaur's maternal uncle who had been running a fever.

While Kaur's father was away, the police arrived at the family farm, looking for him. Kaur testified:

They came and asked where your father is. We said, he is not at home. Then they started searching the house and they ransacked the house. After they search they did not find any item of— any objectionable item. Once they did not find anything, they started breaking our utensils and ransacking the house. When I objected to that, that you have not found any objectionable item, why you breaking our utensils and other article of house? The moment policeman heard this, one of them turned back and slapped me. I said I was not at fault at all. You slapped me. I'm going to report this matter to the senior officers. He immediately got hold of me from arm and said, while you report this matter I will tell you and I was handcuffed.

When Kaur's mother objected to the police's behavior, she was pushed away. Kaur was taken to the police station.

Kaur testified in detail about what happened during the three days she was detained at the station. "Once we reached the police station, there are two policemen standing. They opened the gate with the jeep drove in and once entered they pulled me down and I was put in a small room and they closed that room." "And thereafter after awhile (indiscernible) entered my room. He asked where your father is. I

told that my father has gone to get the welfare of my ailing uncle, but they did not believe me. And he beat me for awhile, about a half hour, and then he left." "They said that your father was helping the militants as well as instigating—misleading the public to stand before the government.... They also blamed me that militants come to you. What are they to you? And why do they come here?"

On cross-examination, Kaur explained the details of her surroundings in the police station:

Q: Tell me about the police station. Was it a one-story building? Two story? What type of building was it?

A: It's one story. Goes on the ground.

Q: Was it a square building? Rectangular building?

A: It was square. Square building. Square.

Q: It was a square building?

IJ to Mr. Chinn [Government Attorney]: Q: That is what the interpreter said. Square building.

\* \* \*

Mr. Chinn to Kaur: Q: When you entered the front door of the police station, what was there? What do you encounter when you enter the police station?

A: Try to show with the fingers that once I entered in the jeep from the main door I was made to get down from the jeep and there was rooms on both sides. Was small (indiscernible) and toward end of right-hand side as is shown, there is small room where I was put in. Where I was (indiscernible). Q: When you say "rooms" do you mean cells? Jail? Prison cells? Or do you mean offices?

A: Trying to make as you enter on the left-hand side there was a office looking—(indiscernible) looking room. Then there were rooms in front. Then in front of the first office there's another room and towards the end of the right, was the room where I was closed.

\* \* \*

Q: How far was it from the entrance of the building to the room where they were holding you?

A: There are about four to five rooms in between the two. That was approximately the distance.

Q: How many feet in a sense?

\* \* \*

Q: In terms of feet, how many feet from the front entrance would it take to get to the room where they were holding you?

\* \* \*

A: Must be at 50 to 80 feet.

Kaur testified that on her second night in the jail, she was raped and beaten by an officer named Eschejro. Kaur testified in detail about this experience:

A: It was 9:00 at night. One policeman came to my room. They told me Eschejro wants to inquire something very important from you. I said at this time I don't want to go anywhere. If you want to ask anything, can come here and ask. He said, are you coming or not. Then he got hold of my arm and dragged me along. And then he took me to that room which is located at the rear of the police station. When there, open the door. Want to tell everything that had happened there?

Q: Yes. I'm talking about what happened when she got to the police station—strike that. Got to that room.

A: Once he opened the door, I saw in front the Eschejro was sitting and having drinks. And the moment I saw that, in the meantime the policeman pushed me inside and closed the door on my back. And I was standing there and Eschejro said, sit with me and drink

with me. I refused to do that and requested him to leave me. I want to go.

Q: And then what happened?

A: Then he got up and bolted the door from inside. Then he got me in his arms from behind. He was trying to embrace me and I was trying to get away from him but he was not leaving—he was not leaving me. Then I bit him on his arm and tried to free myself and run away. Then he got me and slapped me and made me sit there, saying will you sit here or not.

Q: Then what happened?

A: Then he started taking off his clothes. Once he took off his clothes and was approaching me, an alarm sounded. He immediately put on his clothes and left the room and went outside. Then I prayed to the God who saved my honor—

Q: What happened after that?

A:—in the nick of time. Then after half an hour, somebody knocked at the door, but I did not open the door. Then Eschejro spoke from outside, open the door. Then even when I did not open the door. Then he said you bitch, are you going to open the door or not. If you're not, I will deal with you in such a way that you remember for the rest of your life. Then he kept on trying to break the door and then the bolt inside give in—broke, and he entered the room.

As he entered, first he started beating me up. Then he took off his clothes and tore off my clothes. I was crying, shouting for help to save me, but nobody came to save me. [T]hen he forcibly raped me which I can't (indiscernible).

On cross-examination Kaur was asked why, when Eschejro left her because the alarm had sounded, she "didn't just run out the door and try to run out of the police station?" Kaur explained that since "it was a police station I couldn't run anywhere. I thought that was the best to bolt it from inside."

Kaur was released the next morning after her family paid a bribe. She was never charged with a crime or brought before a judge. "Once I reached home, they inquired as to what happened and I had gone inside one room and I was crying when my mother came and asked me as to what all happened. As I was not telling anything, then my mother kept on asking, tell us what happened and I was crying. Then I told that I was forced into that thing there. On that, my mother also started crying and then she went out. Then she made something for me to eat. I don't know what was that. She brought something for me to drink. It was quite bitter, but I was asked to drink."

Kaur testified that soon after she returned home she was sent to live with her uncle in Kullam, another village about forty five minutes away. The police returned to Kaur's family home in December 1995 and asked her mother where she was. "When I left Kullam and police came to my house then my mother told the police (indiscernible), Kullam. Then we left that place and I was moved to my maternal uncle's in laws' place. And, thereafter, sometime I would go to my—another aunt living in Ganganavar." From Ganganavar, Kaur was moved to another aunt's home in Hamjapur.

In July 1996, with the help of a smuggling agent, Kaur left India for the United States. She testified that she flew from India to Germany, and then after a six hour layover, from Germany to Vancouver. She spent one night in Canada, where she was briefly detained by Canadian officials for questioning, and entered the United States in a car crossing through an immigration checkpoint.

Kaur testified that the smuggling agent was paid between 700,000 and 800,000 rupees to bring her to the United States. Kaur described him at her hearing: "He was a man, but he was not sitting along with me in the plane. He was sitting elsewhere. And he had also told me—instructed me not to tell anybody if anybody is traveling with you and you are to say I have come alone." On cross-examination Kaur testified that she did not know the agent's name: "He was quite old. There was no necessity of asking the name. I was addressing him as brother. And I recognized him from his clothes that he's a person—what he was wearing." Kaur did not know what happened to the agent after she came to the United States. "Thereafter he helped me cross the border and let me here and thereafter I do not know. Never met me. Never bothered to ask where he is or where he is not."

On cross-examination Kaur testified extensively about her trip from India to the United States and about the documents she used along her journey. She explained that she had traveled under the name "Gurcharkan Kaur" and that she had used a false passport under this name when leaving India. Kaur explained that she had not brought her own passport from India, but instead had left it with her mother in her village. In Germany, the agent had arranged for Kaur's false passport to be taken away from her.

When Kaur arrived in Vancouver she was briefly detained by Canadian officials. "The place where they stamped the documents, I was made to sit there. They asked me where the passport is. I said, I don't have. They make me sit there and thereafter awhile a person came. He took me along and took me away from there." "Initially, I waited for an hour and a half or so. Then took about an hour for them to do. Thereafter, I left. Took about two

and half hours to three hours. There they fingerprinted me. Took my photographs and like that. They did all those things." When the Canadian officials questioned Kaur, she "told the same thing that police from there harasses me and has dishonored me and merely by being harassed, I left India."

On cross-examination, the government attorney probed Kaur for the nature of her exchange with the Canadian officials. Kaur readily testified that she had told the officials that she had been traveling under a false name: "I told them the name of Ranjeet Kaur. But I as well told them that I traveled in some other name, but now my name is Ranjeet Kaur." As she had been instructed by the agent who accompanied her, Kaur told the Canadian officials that she had traveled alone and that her passport was missing because she had torn it up after leaving Germany. Kaur then described, in some detail, her exchanges with Canadian officials.

Kaur testified on cross-examination that, as arranged by the agent, she stayed with a family that night and crossed with them into the United States at an immigration checkpoint the next day. "In a car. The person who had come along with me from—she didn't say India, but who came along with me and the person where he stayed, his family and me, we all made to sit in one car with that crossed over the border." Kaur explained how the American immigration officials let her through the border as she sat as a passenger in the car. "There is no checking. However, once they start, they said, where are you going? He said, I'm going to get some gas. And he said, my family and my daughters." Kaur testified that she had held the passport of one of her host's daughters in her hand. She did not know the name on the passport. "I don't read that time he give it to me. I just kept it in

my hand closed." "Because everybody had passport in their hands," Kaur explained, the immigration official did not specifically ask for identification from each passenger.

Kaur testified that since she had come to the United States the Indian police have visited her family's farm. "They come, humiliate, beat (indiscernible) threat and ask about me and telling her we are not going to believe her." Kaur's entire family currently resides in India, although she does not know where her father is. On questioning by the IJ, Kaur stated that she had last spoken with her father in 1995. On cross-examination, Kaur explained that she did not know her father's whereabouts:

Q: Is your father in India?

A: Don't know whether he's in India or where he is. I know nothing. I even do not know whether he is living or not.

Q: When was the last time you spoke to your mother?

A: Last night.

Q: And did your mother have any news for you about your father's whereabouts?

A: I spoke to her and asked about others and she started crying so did I and asked again. She said, don't worry. You tell how are you and you'll get out of it. Then I asked about my father. You know anything about my father? She said, no, nothing is known about him as yet.

Kaur's mother still lives on the family farm, but the actual farming is now done by others. "In the past when my father was there, we used to do it [work the farm] ourselves. Since my father has left, it has been leased out on contract." Kaur last saw her mother when she was leaving India. "When—I started off from India (indiscernible) that my maternal uncle—I met my mother with the help of my maternal uncle."

Kaur testified that in the United States, she lives with the family of Jarnail Singh, a friend of her maternal uncle. "I do nothing. I live at Jarnail Singh's house. [ ] She's got two children. I look after them and working in the kitchen, etcetera."

## II. Standard of Review

We review the BIA's denial of asylum or withholding of removal for substantial evidence. *Cordon–Garcia v. INS*, 204 F.3d 985, 990 (9th Cir.2000). A denial must be upheld if supported by "reasonable, substantial and probative evidence" in the record. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (citation and internal quotation omitted). Because the BIA adopted the IJ's adverse credibility findings, we review the IJ's findings for substantial evidence. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002).

While the substantial evidence standard is deferential, an IJ must point to a "specific and cogent" reason supporting an adverse credibility finding, *Alvarez–Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir.2003), and "such reason must be substantial and bear a legitimate nexus to the finding." *Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir.2000) (citation and internal quotations omitted). Inconsistencies in the petitioner's statements must go to the heart of the asylum claim to justify an adverse credibility finding. *Chen v. Ashcroft*, 362 F.3d 611, 617 (9th Cir.2004); *Wang v. Ashcroft*, 341 F.3d 1015, 1021–22 (9th Cir.2003); *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir.2000). "Minor inconsistencies that reveal nothing about an asylum applicant's fear for [her] safety are not an adequate basis for an adverse credibility finding." *Osorio v. INS*, 99 F.3d

928, 931 (9th Cir.1996) (citation and internal quotations omitted).

### III. Discussion

The IJ pointed to six reasons supporting his adverse credibility finding. None of these reasons is supported by substantial evidence. As we are required to do under our case law, we address each reason in turn. *See Wang,* 341 F.3d at 1021 ("To determine whether substantial evidence supports the BIA's finding, *we evaluate each ground cited by the BIA for its finding.*") (emphasis added); *Chen v. INS,* 266 F.3d 1094, 1098 (9th Cir.2001), *overruled on other grounds,* 537 U.S. 1016, 123 S.Ct. 549, 154 L.Ed.2d 423 (2002) ("The task of this court is to determine whether substantial evidence supports the finding of the BIA. In doing so, *we independently evaluate each ground cited by the BIA for its finding.*") (emphasis added); *see also, e.g., Singh v. Ashcroft,* 362 F.3d 1164, 1170–72 (9th Cir.2004) (analyzing each of IJ's several credibility findings independently for substantial evidence); *Shah,* 220 F.3d at 1066–67 (same). We conclude that none of the IJ's reasons, considered either separately or in combination, is "specific and cogent" as required by our case law. *Alvarez–Santos,* 332 F.3d at 1254. We therefore conclude that the IJ's adverse credibility finding is not supported by substantial evidence.

### A. The Passport

█ Kaur put into evidence a copy of her passport, which her mother had sent from India. In her testimony, Kaur never indicated that she had used this passport in leaving India or since that time. When questioned about her passport, Kaur explained that she had obtained it, probably in 1995, to visit the Nankana Sheiv and Panjasahi gurdawaras in Pakistan, but that she had been unable to go because of a quota system that limited the number of people that were allowed to leave from her region.

The IJ expressed two concerns about Kaur's passport, which he called "clearly suspect on its face." First, the IJ stated that "the respondent claims to be named Ranjeet Kaur as a first name. However, the passport is issued in the name of Ranjit." Additionally, the IJ explained that while "the record shows that the respondent, did, indeed, sign the passport .... the block on which her signature appears plainly covers up other parts of that same page and specifically covers up official printing in that same page of the passport."

The IJ raised these concerns with Kaur at the hearing, and the following exchange ensued:

Q: Ma'am, looking at your passport, it says that your name in [sic] Ranjit, RANJIT. However, you signed it RANJEET. Why is it the government of Punjab would issue a passport having one name when you signed it in a different name?

A: That is Ranjeet whether it's with Jit or Jeet.

Q: Well, why didn't the government of India issue a passport in the name of RANJEET?

* * *

A: She's pointing on the main name, RANJIT. I had just shown the name. I have (indiscernible). They have finished themselves.

Q: Yes. Why would they fill it in using a different name than the way you signed it?

A: I have signed in the correct fashion. I have told them of my name Ranjeet. How they wrote, it's their fault. Why didn't they tell it.

Q: So, the government of India issued a passport spelling your name incorrectly. Is that what you're saying?

A: I don't know, they may be mistaken but I must take the route instead of JEET, they wrote JIT.

Q: All right. Let me point to other information on that page that we're looking at. The one with your photograph on your passport. You see your signature, ma'am? It's in the middle of the rectangle? You see your signature, ma'am?

A: Yes. I can see it.

Q: And you see the rectangle?

A: Yes, please.

Q: All right. I want you to look to the right of the rectangle and I want you to notice that there is some printing that is—something has been blotted out by the rectangle. Do you see that? The word "member," I believe it's—or "number"—the word "number" appears just to the right of the rectangle on the right side. There's also another word just below it. Just a minute, ma'am. There's also another word just below it in the English language which is hard to read because it's so small.

A: That is a date.

Q: All right. But my question is, why would the government of India issue the passport with a rectangle that blocks out words on an official passport?

A: I do not know anything about it. I had applied for a passport. They made it and issued it to me.

Through counsel, Kaur provided further explanation for the discrepancies noted by the IJ. Counsel explained that Kaur's name is written in Punjabi, and as with many Punjabi words and names, its phonetic transliteration has many spellings in English, each of which are interchangeably acceptable as the same word or name:

Your Honor, Ranjeet is not an English word. It's a Punjabi word and it can be spelled both ways phonetically, JEET or JIT. Or for that matter, any name, for example even my name is Hardeep, but I spelled it both DEEP or DIP. Half of my documents have IP and half EEP. It's nothing unusual. It's not taken as a different name. It's the same name. Since it's a proper noun. I guess it can be spelled anyway but the main word is Punjabi word. Any English spelling would be a translation, Your Honor.

Kaur's asylum application supports this explanation, as it expressly states that her name can be spelled either way.

Kaur's counsel also explained that Indian passport offices have applicants sign a signature sheet which is later cut down, pasted, and embossed onto the passport. Any stray markings or numbers, counsel explained, were due to a misalignment during the embossing.

And these documents that are prepared by clerks and different offices and they're not necessarily have to comply— the signatures like unfortunately in the passport case, I do not have the original. Otherwise it would be shown that in the rectangle that the Your Honor was pointing out to is glued on afterwards on top of the page, Your Honor. That's why you might notice that the number, the word before that probably would be passport number. And the other one is the date. Date of issue would be the whole line.

But these are embossed on them later. They're not necessarily aligned properly. Because even her school set of paper is the IT. But these are all prepared by government offices, not the respondent herself, your Honor.

The IJ found Kaur's explanations implausible. He stated, "It is implausible that the government of India would issue

an official government passport misspelling the name of the respondent" and that "[i]t is implausible to believe that the government of India would be so careless and sloppy in issuing a passport as to paste over official parts of a government-issued passport." The IJ did not address Kaur's attorney's proffered explanation for the different spellings of "Ranjeet."

■■ [1] The IJ's reasons are not cogent. First, the IJ failed to consider Kaur's counsel's explanation for the inconsistent spellings of Kaur's name. An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency. *See Hakeem v. INS,* 273 F.3d 812, 816 (9th Cir.2001); *Garrovillas v. INS,* 156 F.3d 1010, 1013–14 (9th Cir.1998). Second, the IJ's proffered reasons for disbelieving Kaur are based on his personal conjecture about the manner in which Indian passport officials carry out their duties. "Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Shah,* 220 F.3d at 1071; *see also Singh v. INS,* 292 F.3d 1017, 1024 (9th Cir.2002) (IJ's assumption about police's motives was inappropriate); *Gui,* 280 F.3d at 1226–27 (IJ's assumptions about behavior of repressive government were inappropriate).

### B. The Exchange of Fire with the Militants in 1993

■ The second reason the IJ found Kaur not credible centered on her testimony about the exchange of fire between her father and the militants in 1993. The IJ found this testimony to be "strangely ambiguous and vague concerning such a critical event." Specifically, the IJ stated that on direct examination Kaur testified that "the militants heard some gunshots," and it was only during examination by the

court toward the end of the hearing "that she said that her father had actually gone into his bedroom and fired some gunshots from there." The IJ did not say that these statements were inconsistent. Rather, he said that Kaur's first statement was not sufficiently precise, and that such imprecision was evidence of fabrication. He conjectured, "It is reasonable to believe that if, in fact, that incident had taken place, the respondent would have wasted no time during her direct examination and made the simple declarative statements such as 'my father then went into his bedroom, retrieved his gun and started firing at the militants.'" Because he believed Kaur's "statements were vague and ambiguous as to precisely what happened in her father's bedroom," the IJ found "that the respondent's testimony with respect to this May 1993 incident is simply not worthy of belief."

The "vagueness" in Kaur's recounting on direct examination is not a substantial or cogent reason to support an adverse credibility finding. First, in the record, as quoted above, there is little that is vague or ambiguous in Kaur's statement. She was not asked on direct examination who fired the initial shots in 1993 or from where they were fired. Then, when Kaur was asked by the IJ later in the interview about this incident she answered his questions directly and without ambiguity. Minor inconsistencies and omissions are not appropriate grounds for a negative credibility finding. *See Manimbao v. Ashcroft,* 329 F.3d 655, 660 (9th Cir.2003); *Bandari v. INS,* 227 F.3d 1160, 1166 (9th Cir.2000). *A fortiori,* a general response to questioning, followed by a more specific, consistent response to further questioning is not a cogent reason for supporting a negative credibility finding.

Second, the response that the IJ would have had Kaur provide is based on the IJ's

personal speculation and conjecture. That speculation is based on an unsupported and odd assumption of how exactly a truth-telling asylum applicant (speaking through a translator who spoke broken English) would describe the May 1993 event. Such a speculation is not a proper ground for an adverse credibility finding. Third, the May 1993 incident does not go to the heart of Kaur's claim. In the words of the government's attorney on cross-examination: "This whole incident in May 1993, it actually had nothing to do with [Kaur]." Rather, this episode does no more than to help explain the background for Kaur's claim.

## C. Kaur's Father's Absence

■ The third reason given by the IJ is that he found "puzzling" Kaur's testimony that she had not seen or heard from her father since October 1995, and that her mother had not "provided her ... some information about when her father disappeared, the circumstances under which he disappeared and when he was last seen." The IJ indicated further that corroborating evidence from Kaur's mother was necessary on this point. These are not cogent reasons for an adverse credibility finding.

First, it is unclear why the IJ thought Kaur's ignorance about her father's whereabouts indicated that her testimony was not credible. Notably, the IJ has pointed to no inconsistencies in Kaur's testimony regarding her father's disappearance. Further, it is clear from Kaur's testimony that her own problems with the local police stemmed from their suspicion and summary detention of her father. His disappearance is completely consistent with Kaur's story and claim of persecution.

■ Second, Kaur has consistently testified that neither she nor her mother knows her father's whereabouts. Consequently, it is difficult to understand why the IJ would require Kaur's mother to submit corroborating evidence on this issue, or, indeed, what corroborating evidence her mother *could* provide. Even if Kaur's mother did have corroborating evidence about the father's disappearance, "it is inappropriate to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside the United States." *Sidhu v. INS*, 220 F.3d 1085, 1091–92 (9th Cir.2000).

## D. The Smuggling Agent

■ The fourth reason for the IJ's negative credibility finding is that he found it implausible that Kaur "did not know the name of the agent who accompanied her from her flight from India to Germany or thereafter from Germany to Vancouver." The IJ stated that "it would seem reasonable" that at some time in this journey, which included a six-hour layover, "the two would have engaged in simple, straightforward small talk, among other things, such as exchanging names, first name if nothing else."

The IJ's finding on this point is not cogent. Kaur testified that she did not sit next to the agent on the plane and that after boarding the plane at one o'clock in the morning, she slept for the duration of the flight. She further explained that she did not feel that it was necessary to ask the agent his name, that she recognized him from what he was wearing, and that she addressed him as "brother." The IJ did not address Kaur's explanation for not asking the agent's name, and his assumption that Kaur and the agent would have engaged in "straightforward small talk" is personal speculation. *See Hakeem*, 273 F.3d at 816; *Shah*, 220 F.3d at 1071. The IJ gave no reason supporting his speculation that an agent involved in alien smuggling would reveal his name to the alien. Finally, the fact that Kaur stated that she

did not know the smuggler's name is ancillary to the heart of her claim of persecution. *See Wang*, 341 F.3d at 1021–22.

### E. Kaur's Dealings with Immigration Officials

 The fifth reason given by the IJ for his adverse credibility finding was "the repeated misstatements or outright lies that the respondent gave in getting to this country." The IJ gave three supporting examples. First, he stated that "she clearly used a fraudulent passport in leaving India." Second, the IJ explained that while telling Canadian officials why and how she had left India, Kaur "specifically said that she did not tell them that, in fact, she had been accompanied by someone on the airplane." Third, the IJ recounted how Kaur "represented that she was legally permitted to enter the United States by waiting [sic] or holding someone else's passport in order to gain entrance into this country." Extrapolating from these examples, the IJ was "persuaded that this respondent is prepared to not tell the truth whenever it suits her purposes."

The IJ's reliance on these "misstatements" and "lies" is not a cogent basis to find Kaur incredible. None of the misrepresentations to which the IJ points goes to the heart of Kaur's asylum claim. *See Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir.1999) ("[E]ven if the petitioner had lied about his involvement in the forging of the passport or about how he obtained his South Korean airline ticket, those acts would not support an adverse credibility determination" because they were incidental to his asylum claim.). Moreover, the fact that an asylum seeker has lied to immigration officers or used false passports to enter this or another country, without more, is not a proper basis for finding her not credible. *See id.* at 955–56; *Turcios v. INS*, 821 F.2d 1396, 1400–

01 (9th Cir.1987). Such misrepresentations must instead be evaluated in light of all the circumstances of the case—an evaluation the IJ gave no indication of doing here. *See Turcios*, 821 F.2d at 1400.

Kaur's misrepresentations to Canadian and United States immigration officials and use of a false passport are entirely consistent with her asylum claim. That Kaur used a false passport to leave India, where she testified that she was being harassed and sought after by government officials, is entirely consistent with her claim. Similarly, that Kaur used another person's passport to enter this country is reasonably understood as the act of one seeking refuge in the United States and who is anxious not to be sent back to India. Finally, that Kaur did not explain to Canadian immigration officials that she had been accompanied by a smuggling agent on the airplane must be understood in the context of her claim. Kaur testified that she was explicitly instructed by the agent to tell anyone who asked that she was traveling alone. That she followed the agent's instruction is entirely consistent with the actions of an asylum seeker trying to reach the United States.

### F. Corroborating Evidence

 The sixth reason for the IJ's adverse credibility finding was Kaur's lack of corroborating evidence. The BIA also pointed to this lack of corroboration in denying Kaur's petition, concluding that "[e]ven assuming the respondent is credible, in light of the noted weaknesses, the respondent's testimony alone is insufficient to carry her burden of proof without credible corroborating evidence, which she has failed to provide."

 The law in our circuit is well settled that "an alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without

the need for any corroboration." *Ladha v. INS,* 215 F.3d 889, 901 (9th Cir.2000). We have held elsewhere that when neither the IJ nor the BIA makes an explicit adverse credibility finding, we must accept a petitioner's testimony as credible. *Prasad v. INS,* 101 F.3d 614, 616 (9th Cir.1996). Likewise, when each of the IJ's or BIA's proffered reasons for an adverse credibility finding fails, we must accept a petitioner's testimony as credible. Neither the BIA nor the IJ pointed to any "weakness" in Kaur's case other than the adverse credibility finding, which we have held to be insufficiently supported. In light of the absence of any other "weaknesses" in Kaur's testimony and our clear precedent that outside corroboration is not required when a petitioner's testimony is credible, Kaur is not required to provide corroboration to establish the facts to which she testified.

■ Furthermore, the type of corroboration that the IJ thought necessary—affidavits or letters from friends and neighbors in India—was inappropriate. When required, corroborative materials may be requested by the IJ if they are "easily available." *Sidhu,* 220 F.3d at 1092. It is generally inappropriate, however, "to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States—such corroboration is almost never easily available." *Id.* at 1091–92.

## Conclusion

We hold that the BIA's reasons for finding Kaur not credible were not specific and cogent, and that his adverse credibility finding was therefore not based on substantial evidence. We grant the petition for review and remand for further proceedings consistent with this disposition.

*See INS v. Ventura,* 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002).

Petition GRANTED and case REMANDED for further proceedings.

TALLMAN, Circuit Judge, dissenting:

The central issue in this appeal is whether the immigration judge's adverse credibility determination is supported by "specific, cogent" reasons that are "substantial and bear a legitimate nexus to the finding." *Salaam v. INS,* 229 F.3d 1234, 1238 (9th Cir.2000) (internal quotation marks and citations omitted). In order to grant Kaur's petition we must determine that her evidence "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see also id.* at 481 n. 1, 112 S.Ct. 812 ("[W]e must find that the evidence not only *supports* [granting the petition], but *compels* it . . . .") (emphasis in original). Here, the court fails to apply this extremely deferential standard of review, a standard which is especially appropriate when we review credibility findings. *See Farah v. Ashcroft,* 348 F.3d 1153, 1156 (9th Cir.2003). Because on this record a "reasonable finder of fact would not be compelled to conclude that [her] claim is credible," *Singh–Kaur v. INS,* 183 F.3d 1147, 1153 (9th Cir.1999), I would deny Kaur's petition for review.

The IJ made his adverse credibility finding after presiding over a live hearing. He heard Kaur's testimony on direct and cross-examination, questioned her himself, and cast an experienced eye on the supporting documents she proffered to establish her entitlement to asylum. I disagree with the majority's divide-and-conquer approach to undermine the adverse finding. The reasons supporting the IJ's conclusion that Kaur was not credible should not be

evaluated seriatim, but rather as they interrelate to answer the key underlying question—whether she was telling the truth. Mindful of the stringent standard of review, the IJ's articulated reasons for finding Kaur's testimony untruthful, considered together, are sufficiently cogent and substantial.

Even applying the majority's improper analytical approach, the record does not compel us to grant Kaur's petition. The IJ listed six reasons for his adverse credibility determination, five of which concerned the testimonial and documentary evidence presented at the hearing: (1) the IJ doubted Kaur's account of her father's gunfight with the militants; (2) he was skeptical about Kaur's lack of knowledge regarding her father's apparent disappearance; (3) he found it implausible that Kaur never learned the name of the man who smuggled her into Canada; (4) he factored in Kaur's willingness to lie and misrepresent her true identity to gain entrance first to Canada and then to the United States; and (5) he determined that the photocopied passport Kaur provided at her asylum hearing was fraudulent.

In my view, the court improperly rejects these reasons as insufficient. Particularly troubling is the majority's refusal to credit the IJ's evaluation of Kaur's photocopied passport. This is not a case where the petitioner was for some reason unable to provide legitimate identification documents and admitted as much to the IJ. Rather, Kaur solemnly proffered as authentic a copy of a passport that the IJ determined was fraudulent—a determination that his experience uniquely qualifies him to make. The photocopied passport she submitted at the hearing was the principle document establishing Kaur's identity. As the true identity of the petitioner is clearly at the heart of every asylum petition, the fact that Kaur provided fraudulent identifica-

tion was certainly relevant to the IJ's evaluation of her credibility.

I also disagree with the court's conclusion that Kaur's "misrepresentations to Canadian and United States immigration officials and use of a false passport are entirely consistent with her asylum claim." Maj. at 889. While it is certainly plausible that someone desperate to flee persecution would travel under false documents and lie to border agents in order to make good her escape, this doesn't explain or justify Kaur's admittedly fraudulent entry into the United States from Canada. At some point the alien's justification for "doing everything necessary to flee persecution" reaches the limit of judicial tolerance in a proceeding to determine the legitimacy of her entitlement to refugee status; it should not be allowed to forever insulate any and all misrepresentations from playing any part in the factfinder's credibility calculus. The IJ's consideration of the undisputed fact that Kaur lied to Canadian and United States officials did not detract from the cogent reasoning which led to his determination that Kaur was not credible. It certainly does not compel the opposite finding.

Finally, the court's conclusion regarding the IJ's sixth reason for his adverse credibility finding—Kaur's failure to provide evidence corroborating her claim—fares no better. An asylum petitioner bears the burden of proving that she is eligible for relief. 8 C.F.R. § 208.13(a). In a case where the immigration judge reasonably doubts the petitioner's testimony, the failure to present corroborating evidence should doom the asylum petition. *See id.* ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."); *Chebchoub v. INS*, 257 F.3d 1038, 1042 (9th Cir.2001) ("[T]he regulations unambiguously contemplate cases where an ap-

plicant's testimony alone will not satisfy his burden of proof."). Here, the IJ had legitimate, articulable doubts about the truth of Kaur's story. It was therefore entirely appropriate for him to note the absence of any other evidence that might have bolstered the believability of her testimony.

The fundamental role of the IJ is to decide whether the petitioner is telling the truth. *See Sarvia–Quintanilla v. INS,* 767 F.2d 1387, 1395 (9th Cir.1985) ("[The IJ] is, by virtue of his acquired skill, uniquely qualified to decide whether an alien's testimony has about it a ring of truth."). At its heart, our job as appellate judges is not to nitpick this finding of fact, but rather to evaluate the articulated basis for the subsequent legal conclusions of the IJ and BIA. Far too often, as here, we lose sight of this delegation of responsibilities and upstage the role of factfinder to reach the opposite result. Such outcome-oriented review must be terribly demoralizing to conscientious immigration judges who strive to separate truth from fiction when listening to evidence offered in the obvious self-interest of the asylum seeker. Sadly, we do not give the finder of fact the respect that the record suggests is due in this case.

I dissent.