[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16423

_____

Agency No. A098-878-976

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 18, 2010
JOHN LEY
CLERK

ELSA GHEBREHIWET KIFLEMARIAM,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 18, 2010)

Before EDMONDSON, BARKETT and ROTH,* Circuit Judges.

_____

*Honorable Jane R. Roth, United States Circuit Judge for the Third Circuit, sitting by designation.

PER CURIAM:

## I.  Introduction

Elsa Ghebrehiwet Kiflemariam petitions for review of the order of the Board of Immigration Appeals (BIA) affirming the Immigration Judge's (IJ) denial of her application for asylum, withholding of removal, and relief under the Convention Against Torture.  The BIA upheld the IJ's conclusion that Kiflemariam was not credible and therefore not eligible for asylum.  For the reasons that follow, we will reverse the decisions of the IJ and BIA, grant the petition for review, and remand the case to the BIA for further proceedings.

## II.  Background

A.  <u>Facts</u>

Kiflemariam is a thirty-seven year-old native of Eritrea, a small country located in northeast Africa.  On December 28, 2004, Kiflemariam entered the United States in Los Angeles and applied for asylum approximately ten months later.  Kiflemariam's application was based on persecution she suffered as a result of expressing her political opinion and her fear that she would be subject to further persecution if forced to return to Eritrea.

At eleven years old, Kiflemariam began training to be a nurse in Eritrea's ongoing war for independence from Ethiopia.  Kiflemariam eventually was named a "team leader" in the Eritrean army and was in charge of more than 30 soldiers.

While treating soldiers on the warfront, Kiflemariam suffered severe shrapnel wounds to her head, back, arms and legs.

In 1993, Eritrea gained independence, and Isaias Afewerki, one of Kiflemariam's fellow soldiers, became the de facto president of the country and leader of Eritrea's sole political party, the People's Front for Democracy and Justice (PFDJ). By this time, Kiflemariam was stationed at an army prison which housed former soldiers whose allegiance to the PFDJ was suspect. Because the prisoners had honorably fought for Eritrean independence, Kiflemariam sympathized with their belief that the new government was unfairly punishing them.

Kiflemariam complained to her superiors about the mistreatment of her fellow soldiers who she felt were unjustly imprisoned. As a result, government agents arrested Kiflemariam at her home in October 2000. She was detained for two weeks, during which time she was tied up and questioned extensively about the prisoners under her care, denied food and water, and beaten.

Kiflemariam was then transferred to a prison in the capital city of Asmara, charged with opposing the government, and officially "blacklisted." While there, Kiflemariam was interrogated about her involvement with other political dissidents and received pressure to testify falsely against them. After two months at the Asmara prison, Kiflemariam was released. However, shortly after returning home,

government agents brought her in for further questioning. Kiflemariam was released again after two weeks, at which time she returned to her government-provided home to find that she had been evicted.

In July 2001, Kiflemariam fled Eritrea on foot and went to Sudan. For ten months she remained in Sudan with financial support from friends in Saudi Arabia. Because Kiflemariam feared that the Eritrean government would catch her in Sudan, she obtained a forged business visa and fled to Zimbabwe. However, even in Zimbabwe, Kiflemariam did not feel safe from the reach of the Eritrean government. She also could not find adequate medical treatment for her war injuries. Therefore, in December 2004, Kiflemariam arranged to travel to the United States.

B.    Procedural History

After arriving in Los Angeles, Kiflemariam filed a timely application for asylum, withholding of removal, and relief under the Convention Against Torture. In her application, Kiflemariam detailed her personal experience in Eritrea and submitted documentation evidencing the human rights abuses that many political dissidents experience in that country. She also included two letters from Doctor M.P. Ndiweni who treated Kiflemariam in Zimbabwe in August 2003 and October 2004 for her shrapnel wounds. In the letters, Dr. Ndiweni stated that Kiflemariam

4

was suffering severe pain, required constant supervision, and at times became totally incapacitated.

An asylum officer recommended that Kiflemariam's application be denied. Accordingly, the United States Immigration and Customs Enforcement agency instituted removal proceedings against Kiflemariam on January 14, 2006. At a hearing on her application for asylum, Kiflemariam testified that she was detained by the Eritrean government several times for interrogation and beaten to the point of unconsciousness during her first detention. She also stated that the shrapnel wounds she received during the war make her restless and impatient and that she takes over-the-counter medication for the pain.

Through the aid of a Tigrean language translator, the IJ asked Kiflemariam the following series of questions about whether she sought and received medical treatment after being released from her first detention:

IJ:     All right. On your first detention, were you hurt?

Kiflemariam:  Yes.

IJ:     All right. Now, do we have any medical records? Did you seek any medical assistance once you were released?

Kiflemariam:  Where can I go? I was treating myself with my experience. I would take the anti-pain and other medicines, and I was treating myself.

. . .

IJ: But I'm not, I understand that, yes. But when you were detained and then later released on that first occasion where you say you were hurt, you were beaten, why didn't you go to that doctor and get a statement from him?

Kiflemariam: I went, I went to him sometime later, after that. I didn't go instantly.

IJ: Okay. Is there anything that you've provided from him today regarding that treatment?

Kiflemariam: I have a paper that says if you want to get treatment for this, you have to go out of the country, but –

IJ: No, no, no. We're not talking about the same treatment. You and I need to understand on this. I'm talking about when you were detained the first time. You were hurt, you told me, right?

Kiflemariam: Yes.

IJ: Why didn't you go seek treatment from the doctor who had saw you for the shrapnel wounds for these problems you had from the detention? Why didn't you go to that doctor?

Kiflemariam: I tried myself to contain the problems that I had for about five months, but I saw him five months after my release from detention.

IJ: And you asked him about these problems you had from that detention?

Kiflemariam: Yes, I did.

6

IJ:                 Well, did you ever see a doctor regarding your injuries from the first detention of October 2000?

Kiflemariam:    No, I did not go. I didn't want to go.

IJ:                 You didn't ever see a doctor regarding those injuries?

Kiflemariam:    I did not go. I did not go. With all the problems, I believed I could handle that one, so I didn't go.

IJ:                 So the answer is yes, you never saw a doctor for those injuries.

Kiflemariam:    Yes. I didn't, I did not go instantly, but after some time, when I started feeling the pain, that was when I, I went.

· · ·

IJ:                 Now, ma'am, it appears to the Court that you had two separate and distinct injuries, from your testimony today. You have the shrapnel and bullet wound injuries from 1988, that's one.

Kiflemariam:    Yes.

IJ:                 And number two, we have the injuries, the pain of those injuries from the first detention in the year 2000. Is what I just stated correct?

Kiflemariam:    Yes.

IJ:                 Okay. Now, the Court is questioning you as to whether, upon your release from the first detention, did you ever seek medical treatment?

Kiflemariam:     Only I used my own first aid to treat myself.

IJ:              Okay.  So, now let's make sure we got your answer set. You're telling me that from those injuries or the pain of that first detention, you never, ever consulted a doctor regarding that.

Kiflemariam:     I, I, I treated myself for the pain.  That was (indiscernible).  The medicines that I was taking were also helping me.  But there came a time that I couldn't tolerate pain anymore, and there was a time that I had to see the doctor.

IJ:              So if I ask you, did you ever seek medical treatment from the pain of the injuries from the first detention, it appears your answer is yes, you did, although not immediately upon your release from detention, it was a subsequent time therefrom.

Kiflemariam:     Yes.

IJ:              Is that correct?

Kiflemariam:     You are right.

(Administrative Record (AR) at 182-87.)

On January 31, 2008, the IJ issued an order denying Kiflemariam's application for asylum.  The IJ based his decision on a finding that Kiflemariam's testimony was not credible in two respects.  First, the IJ found that Kiflemariam's testimony about whether she sought medical treatment after her first detention was confused with her statements about the treatment she received for her shrapnel

8

wounds, and therefore not credible. (See AR at 90 ("This was a question and answer series that went back and forth for some seven or eight times, and while it is possible th[at Kiflemariam] could have been confused about the question, surely after the fifth or sixth time that it was asked, the question was clear.")) Second, the IJ concluded that because Kiflemariam appeared physically well enough to sit through the hearing, she must have been exaggerating the state of her condition years prior, as described by Dr. Ndiweni, that she suffered severe pain, sometimes to the point of incapacitation. (See id. at 92-93 (finding that Kiflemariam "was alert, appeared to walk satisfactorily, and has not made any complaint today during this three- to four-hour hearing" and therefore "the Court can't put much weight into" her apparent "miraculous healing since 2003 and 2004.")) Accordingly, the IJ denied Kiflemariam's application for all relief from removal, but granted her voluntary departure.

On appeal, the BIA affirmed the IJ's order denying Kiflemariam's eligibility for asylum. In so doing, the BIA relied on the IJ's determinations that Kiflemariam gave a confusing answer to whether she received medical treatment, that her physical condition appeared to have greatly improved without explanation, and that she did not otherwise meet the statutory requirements for asylum. The BIA therefore affirmed the IJ's denial of Kiflemariam's application for asylum. This

9

petition followed.

## III.    Jurisdiction and Standard of Review

We have jurisdiction over Kiflemariam's petition pursuant to 8 U.S.C. § 1252(a).  We review the BIA's factual determinations under the substantial evidence test, and its legal conclusions de novo.  Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007).  Credibility determinations are reviewed under the substantial evidence test and may not be overturned unless the record compels reversal.  Kueviakoe v. U.S. Att'y Gen., 567 F.3d 1301, 1304 (11th Cir. 2009) (citing Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005)).

When reviewing a decision issued by the BIA, we review only that decision, except where the BIA relied on the IJ's opinion.  Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1275 (11th Cir. 2009).  To the extent that the BIA's decision adopts the IJ's reasoning, we also review the IJ's decision.  Id.  Because the BIA here followed the IJ's reasoning that Kiflemariam was not eligible for asylum based on her incredible testimony, we review both decisions.

## IV.    Discussion

To be eligible for asylum, an applicant must establish that she has suffered past persecution, or has a well-founded fear of future persecution, in her country of origin "on account of race, religion, nationality, membership in a particular social

10

group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An alien who can establish a history of past persecution based on political opinion creates a presumption that she has a well-founded fear of future persecution. Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1232 (11th Cir. 2007). The government can rebut this presumption by showing that, by a preponderance of the evidence, (1) the conditions in the country have changed or (2) future persecution can be avoided by relocating within the country if, "under all the circumstances, it would be reasonable to expect the applicant to do so." DeSantamaria v. U.S. Att'y Gen., 525 F.3d 999, 1007 (11th Cir. 2008) (quoting 8 C.F.R. § 208.13(b)(1)(i)). Asylum may be granted on the basis of past persecution alone if the alien demonstrates (1) "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or (2) "a reasonable possibility that he or she may suffer other serious harm upon removal to that country." Id. at 1007 n.4 (quoting 8 C.F.R. § 208.13(b)(1)(iii)).

The applicant's testimony alone may suffice to establish eligibility for asylum, if the testimony is credible and direct. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. Under the REAL ID Act of 2005, 8 U.S.C. § 1158(b)(1)(B)(iii), an adverse credibility

11

determination may be based on the inherent implausibility of an applicant's testimony or its inconsistency with other evidence and testimony, considering the totality of the circumstances. Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344 (11th Cir. 2008). However, an adverse credibility finding must be supported by "specific, cogent reasons." Tang, 578 F.3d at 1277 (quoting Forgue, 401 F.3d at 1287).

The record compels us to conclude that Kiflemariam gave credible testimony about the persecution she suffered in Eritrea and its lasting effects. We therefore reject the IJ's adverse credibility determinations and the BIA's order upholding them.

The IJ's conclusion that Kiflemariam's testimony regarding whether she sought medical treatment after her first detention was confusing, and therefore not credible, has no basis in the record. Not less than four times, Kiflemariam explained that she did not seek medical treatment immediately after being detained and beaten, but, rather, used her nursing skills to treat herself and saw a physician only when the pain persisted five months later. (AR at 182-83, 185-87.) Although the record reflects some "back and forth" between the IJ and Kiflemariam, the colloquy ended when the IJ confirmed Kiflemariam's testimony, stating "[I]t appears your answer is yes, you did [seek medical treatment], although not

12

immediately upon your release from detention," to which she responded, "Yes . . . . You are right." (Id. at 187.) Considering all of the circumstances, any "confusion" regarding this point was simply the natural by-product of testimony given through a translator, not the mark of inconsistent testimony. See Sarr v. Gonzales, 474 F.3d 783, 794 & n.7 (10th Cir. 2007) (reversing BIA's adverse credibility determination and recognizing that "[a]sylum applicants rarely speak English, and their testimony is plagued with the uncertainties of translation and cultural misunderstanding"); Zavala-Bonilla v. INS, 730 F.2d 562, 566 (9th Cir. 1984) (rejecting BIA's determination that applicant's testimony was not credible, "[d]espite a confusing series of questions, objections, translations, and answers"). We find no basis, let alone a specific, cogent one, for concluding that Kiflemariam's testimony was not credible.

Furthermore, in finding that Kiflemariam's testimony was not credible, the IJ relied on the fact that Kiflemariam's answers seemed to confuse her war injuries with the injuries from her first detention. However, Kiflemariam's vacillation between her shrapnel wounds and her detention injuries was a product of the IJ's own questions, which continued to raise Kiflemariam's war injuries. We will not accept an adverse credibility finding grounded in confusion that the IJ himself caused.

13

We similarly reject the IJ's finding that Kiflemariam's ability to sit through a four-hour hearing raised questions about the evidence that years prior, she suffered severe medical problems to the point of incapacitation, and still requires medical monitoring. Putting aside the obvious possibility that the passage of time may have caused Kiflemariam's physical condition to improve, the IJ never asked Kiflemariam to explain the alleged discrepancy in her physical condition, and thus Kiflemariam never proffered an explanation. To base an adverse credibility determination on the apparent "miraculous" improvement in Kiflemariam's physical condition, when the IJ himself failed to request an explanation, is to create an inconsistency where none in fact existed. Thus, we reject the IJ's conclusion that Kiflemariam exaggerated her condition as pure speculation unsupported by any evidence. See Tang, 578 F.3d at 1278 ("It is appropriate for us to reverse when a credibility determination is based solely on speculation and conjecture."); Ming Shi Xue v. BIA, 439 F.3d 111, 121 (2d Cir. 2006) ("[W]here the perceived incongruities in an asylum applicant's testimony are not plainly obvious, an IJ cannot rely on them to support an adverse credibility ruling without first identifying the alleged inconsistencies for the applicant and giving the applicant an opportunity to address them."); Kaur v. Ashcroft, 379 F.3d 876, 887 (9th Cir. 2004) ("An adverse credibility finding is improper when an IJ fails to address a petitioner's

14

explanation for a discrepancy or inconsistency.").

We find, as a matter of law, that Kiflemariam was otherwise qualified for asylum because she established compelling evidence of past persecution on account of her political opinion – in the form of repeated detentions, harassing interrogations, and beatings – and a well-founded fear of future persecution should she return to Eritrea. See, e.g., Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211, 1217 (11th Cir. 2007) (alien's testimony "in and of itself" that he was arrested, detained without food or water, interrogated, beaten, and threatened "after speaking out against the . . . government" compelled a finding of past persecution); see also Sanchez Jimenez, 492 F.3d at 1234 ("[A] well-founded fear of future persecution can exist even if the applicant 'only has a 10% chance of being shot, tortured, or otherwise persecuted.'") (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987)). We therefore conclude that the BIA erred in affirming the IJ's order. Because the IJ found that Kiflemariam did not establish past persecution or a well-founded fear of future persecution, he did not reach the issue of whether conditions in Eritrea have changed or whether Kiflemariam could safely relocate to another part of the country. Accordingly, we will remand to the BIA for a determination of these issues.

V.    Conclusion

For the foregoing reasons, we will reverse the IJ's and BIA's credibility determinations, vacate the decisions, and grant the petition for review. Because we conclude that Kiflemariam demonstrated that she suffered past persecution on account of her political opinion, she is entitled to a presumption of future persecution. The IJ and the BIA did not address whether the government rebutted this presumption by showing by a preponderance of the evidence that the oppressive conditions in Eritrea have changed or that Kiflemariam could avoid future persecution by relocating within the country. Accordingly, we remand to the BIA for a determination of these questions in the first instance.

**PETITION GRANTED, VACATED AND REMANDED**.