FILED

APR 15 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| GOHAR ABRAHAMYAN, | No. 10-70274 |
| Petitioner, | Agency No. A095-576-188 |
| v. | |
| ERIC H. HOLDER, Jr., Attorney General, | MEMORANDUM[*] |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 6, 2013
Pasadena, California

Before: PREGERSON, BERZON, and CHRISTEN, Circuit Judges.

Gohar Abrahamyan is an Azerbaijani of Armenian ethnicity. She petitions

for review of a Board of Immigration Appeals's ("BIA") decision affirming an

immigration judge's ("IJ") denial of asylum and withholding of removal.[1] We

have jurisdiction under 8 U.S.C. § 1252. We review adverse credibility

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[1] Because Abrahamyan's asylum application was filed before May 11, 2005, this appeal is not governed by the REAL ID Act. *See* REAL ID Act, § 101(h), Pub. L. No. 109-13, 119 Stat. 231 (2005).

determinations for substantial evidence. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). We grant the petition and remand.

**1.** To the extent that the BIA's adverse credibility determination was based on the number of Narodni Front soldiers who wore uniforms, that determination is not supported by substantial evidence. Abrahamyan consistently testified that about fifteen Azerbaijani men beat her and her husband at a grocery store. Further, the exact number of men who wore Narodni Front uniforms while they beat Abrahamyan is minor, it does not reveal anything about the basis of Abrahamyan's fear for her safety, and it is therefore insufficient to support an adverse credibility finding. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660 (9th Cir. 2002).

**2.** To the extent that the BIA's adverse credibility determination was based on perceived inconsistencies regarding the specific instrument with which the Narodni Front soldiers beat Abrahamyan at the airport, that determination is not supported by substantial evidence. In her asylum declaration, Abrahamyan stated that she was beaten with clubs and whipped with a metal cable, but she testified at her hearing that she was beaten with rubber sticks. At the hearing, Abrahamyan explained this discrepancy: she testified that the person who translated her declaration either misunderstood or misinterpreted her, and she clarified that she was beaten with rubber sticks, not clubs or metal cables as stated in her asylum

2

declaration. Indeed, even the interpreter at the hearing was confused by the word "club" and had to refer to a dictionary to translate it. Faulty translations should not be used to hold a petitioner incredible. *See He v. Ashcroft,* 328 F.3d 593, 598 (9th Cir. 2003) ("[F]aulty or unreliable translations can undermine the evidence on which an adverse credibility determination is based."). Neither the BIA nor the IJ addressed Abrahamyan's reasonable explanation for the inconsistency. *Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004) (superseded by statute on other grounds) ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency.").

**3.** To the extent that the BIA's adverse credibility determination was based on Abrahamyan's submission of a fraudulent birth certificate, that determination also is not supported by substantial evidence. The record does not support a finding that Abrahamyan knew or should have known that her birth certificate was inauthentic. *See Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 913 (9th Cir. 2004) (holding that an adverse credibility finding based on the submission of a fraudulent document cannot be sustained where the asylum applicant did not know that the document was fraudulent).

Abrahamyan testified that her birth certificate was left in Baku, Azerbaijan in 1990 when she and her family were forcibly removed from their home because

3

of their Armenian ethnicity. Because of the violence against Armenians in Azerbaijan, Abrahamyan testified that she could not return home to retrieve any of her identification documents. She testified that her husband paid a man $500 to retrieve a copy of her birth certificate from Azerbaijan. It turned out that the birth certificate was fake. Abrahamyan testified that she believed the birth certificate was real, and she would not have submitted the birth certificate to the court had she known it was counterfeit. She testified that she did not know if that man lied about going to Azerbaijan, but Abrahamyan believed the birth certificate was real because the man was "so confident, he assured [her] husband that he had . . . help[ed] other people . . . , [so her] husband believed him."

Although Abrahamyan testified that she would not be surprised to learn that the birth certificate was fake, this uncertainty likely reflects that neither she nor her husband personally obtained the copy of her birth certificate from Azerbaijan. But neither she nor her husband could have been expected to personally obtain her birth certificate: according to her testimony, Abrahamyan believed it was too dangerous to go back to Azerbaijan to retrieve her birth certificate because Armenians were not allowed to go to "Azerbaijan to get any kind of assistance for any kind of document."

Indeed, evidence from the 2005 Country Report on Azerbaijan supports

4

Abrahamyan's testimony that Armenians faced many problems obtaining identification documents from Azerbaijani officials and that paying bribes for official documents was not abnormal. 2005 U.S. State Department Country Report on Human Rights Practices in Azerbaijan (stating that "officials often extracted bribes or harassed Armenians who applied for passports," and even Armenians of mixed Armenian-Azerbaijani descent "had problems . . . when applying for identification cards"). Thus, the record shows only that Abrahamyan believed—but could not be sure—that her birth certificate was authentic. The IJ's conclusion that Abrahamyan was willfully blind is not supported by the record.

Further, that Abrahamyan submitted an allegedly fake birth certificate cannot by itself provide substantial evidence to support a finding that she lacks credibility, where the record indicates that she did not know that the certificate was fraudulent and nothing else in the record suggests that she is not credible. *See Yeimane-Berhe*, 393 F.3d at 911.

Finally, Abrahamyan was not required to corroborate her claims with an affidavit from her husband in Russia, as stated by the BIA and IJ. "In a pre-REAL ID Act case, absent other substantial evidence of adverse credibility, the production of corroborating evidence cannot be required." *Li v. Holder*, 629 F.3d 1154, 1160 (9th Cir. 2011). Here, because "each of the IJ's or BIA's proffered

reasons for an adverse credibility finding" has "fail[ed], we must accept [Abrahamyan's] testimony as credible," and no further corroboration is required to establish the facts to which she testified. *Kaur*, 379 F.3d at 890. Furthermore, even if corroboration were required, neither the BIA nor the IJ addressed Abrahamyan's explanation that she did not know that she was permitted to submit a statement from her husband explaining how he obtained the birth certificate. *See Sidu v. INS*, 220 F.3d 1085, 1092 (9th Cir. 2000) (the petitioner must be given an opportunity to explain the failure to provide corroboration if corroboration is required). Finally, "[i]t is generally inappropriate . . . to base an adverse credibility finding on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States," because "such corroboration is almost never easily available." *Kaur*, 379 F.3d at 890 (internal quotation marks and citation omitted). Any reliance on Abrahamyan's failure to obtain corroboration from her husband, therefore, was made in error.

**Petition GRANTED and REMANDED.**